Reversed and remanded for further proceedings consistent with this opinion.

IN THE MATTER OF THE PETITION OF NEW JERSEY NATURAL GAS COMPANY TO HAVE RELE, INC. AND/OR REDI-FLO CORPORATION OF NEW JERSEY, ADJUDGED A PUBLIC UTILITY.

Superior Court of New Jersey
Appellate Division

Argued November 10, 1969—Decided March 26, 1970.

Before Judges GOLDMANN, LEWIS and MATTHEWS.

Mr. *Robert N. Wilentz* argued the cause for appellants Rele, Inc. and Redi-Flo Corporation of New Jersey (*Messrs. Wilentz, Goldman & Spitzer,* attorneys).

Mr. *Sidney M. Schreiber* argued the cause for respondent New Jersey Natural Gas Company (*Messrs. Schreiber & Lancaster,* attorneys).

Mr. *William Gural,* Deputy Attorney General, appeared but did not argue for respondent Board of Public Utility Commissioners (*Mr. Arthur J. Sills,* Attorney General, attorney).

The opinion of the court was delivered by

GOLDMANN, P. J. A. D. Rele, Inc. and Redi-Flo Corporation of New Jersey appeal from a determination of the Board of Public Utility Commissioners (Board) that they are subject to the jurisdiction of the Board in that they fall within the definition of a public utility and the requirements for jurisdiction set out in *N. J. S. A.* 48:2–13.

New Jersey Natural Gas Company filed a petition with the Board praying that *Rele* be declared a public utility by virtue of its distribution of oil from a central tank through a pipeline distribution system in a housing development known as Holiday City, located in Dover Township, and that it be made to comply with such provisions of *Title* 48, "Public Utilities," and Board rules and regulations as might be applicable. An answer was filed by *Redi-Flo* admitting that it was a New Jersey corporation "engaged in the business of distributing oil from a central tank through a pipeline distribution system to the owners of private homes in [Holiday City] and that its pipeline distribution system is located in part under land which is now or may become public streets." The answer denied that Redi-Flo was a public utility.

At the hearing before the Board the petition was amended to include Redi-Flo as a respondent, the same allegations

being made against it as had been asserted against Rele. The amended petition sought an adjudication that either company or both be adjudged a public utility. The answer was then amended so that it was equally applicable to both companies.

The evidence adduced before the Board consisted primarily of stipulated facts, documentary evidence and the testimony of the president of Hovsons, Inc., the developer of Holiday City.

Rele and Redi-Flo are related New Jersey corporations, engaged in the retail distribution of fuel oil to homes through a central pipeline system. They operate a single system of this type in the Holiday City subdivision in Dover Township. The installation consists of two 20,000-gallon storage tanks, a pumping station and a network of distribution mains in the streets, connecting with service lines running to the individual homes. Fuel consumption in each home is monitored and recorded by a meter located on the service connection for each house. Rele owned the entire distribution system until February 1968. After that date all the facilities were owned by Redi-Flo, with Rele continuing to manage and operate the system itself.

Holiday City is a planned retirement community consisting of one-family, duplex and quad units. The first two phases of the development contemplated some 1,530 residences. In addition, there are two adjoining tracts consisting of 24 acres which Hovsons, Inc. may develop in the future. The development was promoted in the usual manner by constructing model homes and by advertising in the New York metropolitan area. Hovsons would submit to prospective purchasers an estimate of living costs, including the cost of fuel oil. As of July 15, 1968, the date of the Board hearing, Hovsons had sold some 1,300 homes, and 950 families were already living in Holiday City. Every purchaser had entered into a form agreement, described hereinafter, to purchase oil from Rele.

In March 1965, while the Holiday City project was in the preliminary stages of development, Rele (the predecessor of Redi-Flo) entered into an agreement with Hovsons whereby it was given the "sole and exclusive right and privilege to install, maintain and operate a pipe line fuel oil distribution system (including meters, storage tanks, oil transmission lines, valves, and all other components and auxiliary equipment)" in Holiday City. Hovsons agreed to sell Rele a lot in the development for the installation, maintenance and operation of its fuel oil storage tanks, buildings, mains, feeder lines and other equipment. Hovsons further agreed to grant Rele such easements and rights of way throughout the tract as might be necessary for the installation, maintenance and operation of the system, including the streets intended to be dedicated to public use. In addition, Hovsons agreed that easements from the streets to the several residences would be reserved in favor of Rele at the time of sale of the houses.

The agreement also provided that the developer would use its best efforts to induce prospective homeowners to connect to the system. For this promotional effort Rele initially agreed to pay Hovsons $130 for each customer. (A supplemental contract covering the second phase of the Holiday City development provided that Hovsons would receive 2¢ a gallon for all oil sold to customers over a 25-year period, instead of the $130 payment which related to the first phase of the development.) If Hovsons obtained less than 99% of the homeowners for Rele, it agreed to pay Rele $75 for each home that did not tie into the system. Rele was to furnish all advertising literature to promote the system, Hovsons agreeing to have its salesmen learn about the system's benefits. Rele paid Hovsons $9,000 for brochures naming the system to be installed in Holiday City.

A significant provision of the Hovsons-Rele agreement was Hovsons' covenant that "no other system for distribution of fuel oil, heat, or other form of energy or fuel used to heat buildings shall be introduced or permitted within the Tract for promotional or advertising purposes."

After Hovsons had conveyed a lot in the development to Rele, Rele proceeded to obtain a building permit for the erection of its oil storage tanks and pumping station. Distribution mains were installed in the streets which would later be dedicated to the public. The meters installed in the Holiday City houses were inspected by the New Jersey Bureau of Weights and Measures. The system went into operation in September 1965.

Rele entered into a separate agreement on a year-to-year basis with each consumer in the development by which it agreed to install its system to furnish fuel oil to the heating plant of each dwelling and to supply the meter. The contract guaranteed that the price charged for fuel oil would not exceed the year's average retail price charged in the local market by major suppliers. Rele was to notify the consumer on June 1 of each year as to the price which would prevail for the year following. The homeowner could either pay each month, by reading his meter and computing the bill, or budget the estimated annual bill over a 12-month period and pay equal monthly installments. Meters would be read as of May 31 each year and the adjustment, if any, made between the parties as of that date.

Rele reserved the right to terminate the consumer's contract, in which case, if the consumer was without fault, it agreed to install at its own expense a 275-gallon fuel oil tank, together with the facilities necessary to give the consumer a fully operative independent fuel oil system. The homeowner had the right to terminate upon 60 days' notice, in which event he would be responsible for installing his own tank.

Of the 950 families that had moved into Holiday City as of the date of the Board hearing, all but 9, who subsequently desired to use electricity for heating or hot water, had connected to the Rele-Redi-Flo system. Thus, the system serviced 99% of the homes.

We note that Rele is a New Jersey corporation whose purposes, as stated in its certificate of incorporation issued in 1953, are quite general. Redi-Flo's charter, issued in 1965, authorizes it, among other things, to "own, manage, maintain and operate, plants, buildings, structures, works, mains, pipes, pipelines and pipeline systems," and to "market, distribute, transport and handle petroleum products, at retail and wholesale."

Sometime after New Jersey Natural Gas Company filed its petition with the Board, Public Service Electric and Gas Company sought to intervene in the proceedings. While no formal order allowing intervention was issued, the company was represented in and notified of all subsequent proceedings. Following a brief hearing at which, as noted, most of the facts were stipulated and the testimony of Hovsons' president taken, and the subsequent filing of briefs, the Board determined that Rele and Redi-Flo were public utilities subject to its jurisdiction. They were ordered to comply with all the public utility statutes, *Title* 48, including those requiring the filing of a tariff. This appeal ensued, and pending its determination we ordered (all parties consenting) that the decision and order of the Board be stayed.

*N. J. S. A.* 48:2–13 provides, in pertinent part:

The board shall have general supervision and regulation of and jurisdiction and control over all public utilities as hereinafter in this section defined and their property, property rights, equipment, facilities and franchises so far as may be necessary for the purpose of carrying out the provisions of this Title.

The term "public utility" shall include every corporation * * * that now or hereafter may own, operate, manage or control within this State any railroad, street railway, traction railway, autobus, canal, express subway, *pipeline*, gas, electric light, heat, power, water, *oil*, sewer, telephone or telegraph system, plant or equipment for public use, under privileges granted or hereafter to be granted by this State or by any political subdivision thereof. [Emphasis added]

Rele and Redi-Flo concede the literal applicability of the statute, and they admit that the tests ordinarily used to

determine what is a public utility probably fit them "like a glove." However, they inveigh against a literal reading of the statute or a mechanical application of tests which they consider irrelevant in the context of this case. In essence, they contend that there is no "locked-in consumer group," and therefore no need "to protect consumers from over-reaching, or poor service from a supplier of a necessity in a monopolistic position, because there is no monopolistic position." We shall refer to this argument shortly, in the meantime addressing ourselves to the requirements of *N. J. S. A.* 48:2–13.

The definition of "public utility," as including any corporation which owns, operates, manages or controls within New Jersey any oil system, plant or equipment, in clearest fashion covers Redi-Flo, which owns the Holiday City fuel oil system, and Rele, which operates that system, provided the other statutory prerequisites are met. *N. J. S. A.* 48:2–13 sets out two criteria for the proper exercise of jurisdiction by the Board of Public Utility Commissioners, namely, (1) whether the system, plant or equipment is operated "for public use" and (2) whether this is done under privileges granted by the State or any of its political subdivisions.

In *Lewandoski v. Brookwood Musconetcong River, etc., Ass'n,* 37 *N. J.* 433 (1962), the Supreme Court reviewed a Board determination that a particular water distribution system was a public utility. The system was set up, operated and managed by an incorporated non-profit association of lot owners in a residential development, for the benefit of those who purchased lots in the development and the purchasers of lots in adjoining lands that the developer might acquire. The court held (at 445–446) that whether the water system was operated "for public use" depended on "the character and extent of the use," and not on the formal structuring of the operation. The Association's water system was held to be a public utility since it supplied "a broad group of consumers"; the fact that the supplier was

under no obligation to supply water to the general public or any portion thereof was immaterial with respect to the jurisdiction of the Board. By contracting with the developer, the Association had created a water system for the benefit of its potential members, *i. e.,* future purchasers of lots, including not only those in the existing development but also those who might buy in any adjoining property the developer acquired.

While the *Lewandoski* court emphasized the importance of a regular water supply as such, its conclusory discussion with regard to the characterization of operations for "public use" is clearly in point; in fact, the factual pattern is not too dissimilar from that in the present case, albeit the systems are different. The "character and extent" of the use — a direct supply of fuel oil from a central point — is clearly to service virtually all persons who bought or will buy houses in Holiday City. In light of the *Lewandoski* reasoning and holding, we find more than sufficient evidence in the record to support the Board's determination that Rele and Redi-Flo are maintaining and operating their system for "public use."

The second statutory prerequisite to a finding of jurisdiction in the Board is a determination that the operations were conducted under "privileges granted * * * by this State or by any political subdivision thereof." This provision has been broadly construed, and it is apparent that a "privilege" is not limited to franchises. As the court in *Lewandoski* pointed out (at 447), *N. J. S. A.* 48:2–13 does not provide that the "privileges" must be franchised in order to make the water supplier subject to Board jurisdiction. *Cf. N. J. S. A.* 48:2–14. "Privileges," said the court, may take various forms. For example, it has been held sufficient to satisfy this requirement that the utility be incorporated under the New Jersey Corporation Act; that it is privileged to carry on business in this State, and that it thereby enjoy certain tax advantages. *Acquacka-*

*nonk Water Co. v. Board of Public Utility Commissioners,*
97 *N. J. L.* 366, 370–371 (Sup. Ct. 1922), aff'd *sub nom.*
*East Jersey Water Co. v. Board of Public Utility Commis-*
*sioners,* 98 *N. J. L.* 449 (E. & A. 1923) ; and see *Lewandoski,*
at 448. In this connection, it is appropriate to refer to the
powers granted Redi-Flo in its certificate of incorporation,
mentioned above. Moreover, like the water mains in
*Lewandoski,* so here, the fuel oil distribution system runs
under streets in the development which shall be or have al-
ready been dedicated as public streets — a privilege enjoyed
from the municipality. Although minor, note should also be
taken of the fact that the meters which measure the flow
of fuel oil are inspected by the State Bureau of Weights and
Measures. See *N. J. S. A.* 51:9–2. We therefore conclude
that the Board was correct in determining that the Rele-Redi-
Flo operations were conducted under privileges granted by
the State and by the municipality.

To paraphrase what was said in *Lewandoski* (at 449), the
companies in question are within the spirit and letter of
the State: they are the owner and operator of a fuel oil
pipeline system constructed in a large real estate development
for the purpose of fulfilling assurances to purchasers of
homes that oil will be supplied for heating and other pur-
poses. They are therefore subject to the jurisdiction of the
Board, whose supervision and control will provide a most
effective method of providing homeowners in Holiday City
with a safe and adequate supply of oil at reasonable rates.

Although *N. J. S. A.* 48:2–13 expressly and clearly em-
braces a fuel oil pipeline distribution system of the kind
herein described, defendants would add a new test which
nowhere appears in the statute, namely, that there must
be a locked-in consumer group receiving a necessity of life
through a monopolistic supplier. Not only does this ap-
proach contravene the statute, but defendants, in our view,
meet their own test. Rele and Redi-Flo have the ex-
clusive right to distribute oil from their central tanks

through an underground pipeline distribution system in Holiday City. This right is expressly provided for in paragraph 2 of the original agreement of March 1965 between Rele and Hovsons. Only Rele (and now Redi-Flo) has been granted the necessary easements and rights of way by the developer. Hovsons would not permit New Jersey Natural Gas Company to run its mains in the streets when developing the area because what the company had to offer the developer was not comparable to what it got from Rele. The consumer was, to all intents and purposes, effectively "locked-in." True, a homeowner had the option, upon 60 days' written notice, to discontinue using the fuel oil distribution system, in which case the supplier could remove all of its equipment, reserving the right to leave its pipes underground and its facilities in the consumer's residence. In the event of such a termination not caused by the failure of the supplier to comply with the terms of its agreement with the consumer or default thereunder, the cost of installing an independent fuel storage system and such other appurtenances which might be necessary, was to be borne by the consumer.

The fact is that of all the 1,300 homes sold in Holiday City, every consumer entered into an oil contract with Rele (Redi-Flo). It was to Hovsons' advantage to see to it that every home purchaser tied into the system, for it received $130 for each house in the first tract and 2¢ a gallon for oil sold over a 25-year period in the second tract. If Hovsons was not successful in getting at least 99% of its purchasers to tie into the system, it was subject to a penalty provision. Of the 950 purchasers up to the time of the Board hearing, it is significant that only 9 had opted to change over to electricity.

Rele and Redi-Flo argue that they are not monopolistic. In the measure that a Holiday City homeowner may elect to change over to some other source of supply, such as tank delivery or electricity, that is so. But the same would be true of homeowners in a development using elec-

tricity or natural gas. Those using electricity might choose to use fuel oil or gas. Those using gas for heat and hot water could change over to electricity or fuel oil or even bottled gas. Could it reasonably be argued that an electric company or a natural gas company—both considered public utilities—could claim that they were not within *N. J. S. A.* 48:2–13 because they fell short of being monopolistic?

Rele and Redi-Flo pose the question of whether the conventional tests for determining what is a public utility "have become so embedded in our law that, because of them, a statute designed to protect consumers from utilities can be used to protect utilities at the expense of consumers." The question is one that should, more properly, be addressed to the Legislature which has carried over the inclusion of oil systems in the 1911 definition of a "public utility" (*L. 1911, c. 195,* § 15) into *N. J. S. A.* 48:2–13. All the consumer protective measures which the companies say should be applied to a public utility are appropriate to them. To quote from their brief, they "must not increase prices unreasonably," "must not discriminate," "must not provide anything other than good service" because of "the factual dependence of the consumer on that one supplier." (This last observation assumes that the homeowner may not change over to some other source of supply, such as electricity or tank delivery.)

We cannot ignore the language of *N. J. S. A.* 48:2–13. To accept the argument advanced by Rele and Redi-Flo would render the reference to "oil * * * system" nugatory.

█ Defendants attempt to bolster their position by asserting that each class of public utility is treated separately in *Title* 48. This was not so when the Public Utility Act was originally enacted in 1911. It was only after the Public Utility Act was completely revised that there was a grouping of laws dealing with particular utilities.

█ The companies also argue that since they are not subject to the gross receipts tax under *N. J. S. A.* 54:30A–

54, as are some utilities, that the Legislature did not intend that they fall within *Title* 48. But then, a number of public utilities are not included in that statute—for instance, telephone and telegraph systems, railroads and autobusses. *Cf. N. J. S. A.* 54:13–11(d), imposing a corporate franchise tax on oil or pipeline companies.

The determination and order of the Board of Public Utility Commissioners is affirmed.