71 N.J. 14 (1976)
362 A.2d 552
IN THE MATTER OF THE APPLICATION OF THE BOROUGH OF SADDLE RIVER FOR AN INCREASE IN RATES APPLICABLE TO SOLID WASTE COLLECTION AND FOR A DETERMINATION THAT THE NEW JERSEY BIDDING STATUTES ARE INAPPLICABLE THERETO.
The Supreme Court of New Jersey.
Argued December 1, 1975.
Decided July 19, 1976.
*16 Mr. Brian D. Vesley argued the cause for appellant Borough of Saddle River (Messrs. Evans, Hand, Allabough and *17 Amoresano, attorneys; Mr. Vesley of counsel and on the brief).
Ms. Carla Vivian Bello, Deputy Attorney General, argued the cause for respondent Board of Public Utility Commissioners (Mr. William F. Hyland, Attorney General of New Jersey, attorney; Mr. Stephen Skillman, Assistant Attorney General, of counsel; Ms. Bello on the brief).
Mr. William Gural, Director of Division of Rate Counsel, argued the cause for amicus curiae Department of Public Advocate (Mr. Stanley C. Van Ness, Public Advocate, attorney; Mr. Gural of counsel and on the brief).
The opinion of the Court was delivered by MOUNTAIN, J.
This case presents the question of whether municipalities are still required by N.J.S.A. 40:66-4[1] to advertise for competitive bids with respect to solid waste collection contracts, following the passage of the Solid Waste Utility Control Act of 1970, N.J.S.A. 48:13A-1 et seq., which places persons engaged in solid waste collection and disposal under the jurisdiction of the Board of Public Utility Commissioners (hereafter PUC or Board).
Petitioner, the Borough of Saddle River, is a small residential community in which most of the houses are located *18 on large lots and have long driveways. Its residents require rear-yard pickup from their solid waste collectors. Until 1969, solid waste was collected by a private scavenger, licensed by petitioner, who was paid directly by the individual residents. This service deteriorated to the point where petitioner's officials considered that uncollected garbage was becoming a health hazard. As a result, petitioner decided to contract for scavenger service at the municipal level. It advertised for bids twice in 1968 and once in 1969, without success. Eventually petitioner passed a resolution declaring that a health emergency existed,[2] and on October 20, 1970, negotiated a contract with Leone Brothers, a local scavenger, by the terms of which Leone was to provide pickup services and equipment, using a vehicle supplied by petitioner.
The Borough of Saddle River describes itself as having been pleased with the quality of Leone's work. During 1972, however, it became apparent that the Borough's residents required more extensive services. Leone also found that the compensation agreed upon was not adequate to bring in a fair rate of return. Consequently, on March 26, 1973, after considerable negotiation, the parties signed an amendment to the contract to become effective May 1, 1973. This amendment extended the term of the original contract for one year (i.e., until December 31, 1975), enlarged the pickup services to be performed, and increased the compensation to be paid Leone.
Shortly after the signing of the original contract, the Solid Waste Utility Control Act, N.J.S.A. 48:13A-1 et seq., went into effect.[3] Pursuant to its provisions, the *19 PUC promulgated regulations for solid waste collection and disposal utilities, N.J.A.C. 14:3-10.1 et seq., requiring, among other things, that scavengers file with it their tariffs, rate schedules and contracts. N.J.A.C. 14:3-10.10. The amendment to the contract with Leone of March 26, 1973, which had been expressly conditioned upon approval by the PUC, was accordingly filed with that Board.
On April 25, 1973, petitioner made formal application to the Board, requesting approval of the contract as amended. It also sought a declaratory ruling that solid waste collectors are public utilities within the meaning of the exception to the competitive bidding requirements of the Local Public Contracts Law,[4]N.J.S.A. 40A:11-5(1) (f), so that municipalities need not advertise for bids when entering into solid waste collection contracts.
The Board's hearing examiner found support for petitioner's position and recommended to the Board that it issue the declaratory ruling and approve the amended contract (which had not been the result of competitive bidding) as requested. He also recommended, however, that the Board petition the Legislature to remove solid waste disposal and collection utilities from the list of public utility exceptions, stating his belief that
the public interest would best be served by having an added check (in addition to Board supervision) to insure that rates and charges for solid waste collection/disposal services rendered to governmental entities are reasonable and that service is proper.
(Hearing Examiner's Report and Recommendations, Docket No. 734-331, Nov. 21, 1973).
The Board, while agreeing with the examiner that a comparison of the relevant statutes appeared to support petitioner's *20 contention that competitive bidding was no longer required for solid waste collection services, declined to issue a declaratory ruling. The bases for this decision were twofold. First, the Board believed, as did the examiner, that competitive bidding as well as Board supervision was necessary to protect the public interest. Second, the Board considered itself bound by the then recent holding in Capasso v. Pucillo, 132 N.J. Super. 542 (Ch. & Law Div. 1974), that the statute requiring competitive bidding for solid waste collection, N.J.S.A. 40:66-4, had not been repealed by implication. In its decision and order of March 14, 1974, the Board recommended to the Legislature that clarifying legislation be enacted setting forth unequivocally that competitive bidding is required with respect to contracts with solid waste collection utilities, except in such areas as the Board might in the future, pursuant to N.J.S.A. 48:13A-5, designate as franchise areas.
Petitioner appealed to the Appellate Division, which, in an unreported opinion, upheld the Board on the authority of its earlier decision in Capasso v. Pucillo, 132 N.J. Super. 473 (App. Div. 1974). We granted certification, 68 N.J. 165 (1975), to resolve the question of how the statutes involved can be harmonized so as best to carry out the policies of the Legislature.[5]

*21 I
In this era of environmental concern, there can be no doubt that the activity of collecting and disposing of solid waste is affected with a public interest and is consequently an appropriate subject for regulation by the state. Hackensack Meadowlands v. Municipal Sanitary Landfill Authority, 68 N.J. 451 (1975); prob. juris. noted sub nom. City of Philadelphia v. New Jersey, ___ U.S., 96 S.Ct. 1504, 47 L.Ed.2d 760 (1976); Southern Ocean Landfill, Inc. v. Mayor & Council, Township of Ocean, 64 N.J. 190 (1974); Ringlieb v. Township of Parsippany-Troy Hills, 59 N.J. 348 (1971). In amending N.J.S.A. 48:2-13 to include solid waste collection and disposal facilities within the definition of public utilities, and in enacting the Solid Waste Utility Control Act of 1970, N.J.S.A. 48:13A-1 et seq., the Legislature has chosen supervision by the PUC as one of its regulatory mechanisms.[6]
In taking this step, the Legislature departed to some extent from the traditional concept of a public utility, which might perhaps be characterized as an enterprise enjoying monopoly power by virtue of a governmentally granted franchise, and as a result requiring regulation in the public interest. But New Jersey has long since abandoned the view that the concept of a public utility must entail "a locked-in consumer group receiving a necessity of life through a monopolistic supplier." In re Petition of New Jersey Natural Gas Co., 109 N.J. Super. 324, 333 (App. Div.), certif. denied 56 N.J. 475 (1970). With the passage of the Solid Waste Utility Control Act, the Legislature has further expanded the definition of a public utility to meet the requirements of an increasingly complex and interdependent society.
*22 Such an expanded concept would appear to carry with it the need for differing regulatory techniques appropriate to the variety of enterprises now emerging as public utilities. The structure of the solid waste collection industry is not monolithic, like that of the more conventional utilities  railroads, electric, gas and telephone companies. Rather, the industry is composed of numerous scavengers, serving overlapping territories and utilizing landfill sites run by various governmental and private operators. From testimony adduced at the many legislative investigations of the industry, it is apparent that the system as it existed prior to the passage of the Solid Waste Utility Control Act not only tended to inefficiency in the form of wasteful fragmentation and conflicting licensing requirements, but also was fraught with the potential for abuse in the form of favoritism, rigged bids, official corruption, and the infiltration of organized crime.[7] To remedy this situation, while at the same time giving due attention to the public health and environmental aspects of the industry, most of the recommendations to the Legislature stressed the importance of encouraging competition within a regulated framework.
Underlying petitioner's arguments would appear to be the unstated premise that competitive bidding and public regulation cannot coexist. This would seem to be an impermissible assumption. It is true that many public utilities, notably common carriers, are required to publish tariffs which apply equally to all customers and hence preclude the negotiation of individual agreements. Others, however, conduct many of their operations pursuant to contract. Conspicuous among these, at the Federal level, are natural gas companies and *23 electric power companies regulated by the Federal Power Commission.[8] Many New Jersey examples also exist. See e.g., Hackensack Water Co. v. Board of Public Utility Commissioners, 96 N.J.L. 184 (E. & A. 1921) (water); Edison Storage Battery Co. v. Board of Public Utility Commissioners, 93 N.J.L. 301 (Sup. Ct. 1919) (electricity).
Such contracts, although their provisions are agreed upon by the parties, are nevertheless subject to modification by the Board of Public Utility Commissioners in the public interest. See, e.g., New Jersey Suburban Water Co. v. Riordan, 4 N.J. Misc. 256, 259 (Sup. Ct.), aff'd 103 N.J.L. 498 (E. & A. 1926):
[S]ince the adoption of the Public Utilities act of 1911, a contract between a municipality and a water company, fixing the rate to be charged for service, imposes no restrictions on the sovereign power of the state to fix just and reasonable rates as subsequent conditions may make desirable, and when the state, through its board of public utility commissioners, exercises its sovereign power over rates, the contract rights of the parties must yield.
The fact that a contract, instead of being negotiated, is arrived at after competitive bidding is clearly of no significance in this context.
The Board has interpreted N.J.S.A. 48:13A-7[9] to authorize its review of contracts between solid waste collectors *24 and municipalities, whether or not these are the result of competitive bidding. In the Matter of the Petition of F.M. Leise, t/a Hudson Haulage Co., PUC Docket No. 713-165 (Order, July 20, 1972); In the Matter of Joseph P. Clancy Providing Scavenger Service to the Borough of Upper Saddle River, PUC Docket No. 724-322 (Decision and Order, October 12, 1972). In the present case, both the hearing examiner and the Board stressed their belief in the continued importance of competitive bidding in the solid waste collection industry. An administrative agency's interpretation of a statute it is charged with enforcing is entitled to great weight. In re Glen Rock, 25 N.J. 241, 246 (1957) and cases there cited. Furthermore, in this instance the Board's interpretation coincides with our own understanding of the intent of the Legislature. In view of the strong public policy favoring competitive bidding[10] and the whole tenor of the Solid Waste Utility Control Act,[11] we think it evident that the Legislature intended that municipalities enter into solid waste contracts only after advertising for competitive bids. The subsequent filing of the contract with the PUC, which then reviews its provisions and may modify them if it finds the rates are not reasonable, provides an additional safeguard for municipal corporations. Not only do they have the advantage of competitive pressures to secure them the lowest possible rates, but they are protected against the possibility *25 of extortionate or excessively high bids by the regulatory authority of the Board of Public Utility Commissioners.[12]
Petitioner objects that the Appellate Division's conclusion that the PUC may approve solid waste collection contracts "in reliance on the safeguards of competitive bidding" contravenes the holding of In re Intrastate Industrial Sand Rates, 66 N.J. 12 (1974). In that case, this Court held that the PUC could not approve a rate increase for railroad freight carriage without first holding a formal hearing to establish the utility's rate base and rate of return. That decision was grounded on the fact that the Legislature, in N.J.S.A. 48:2-21.2, had enumerated only three exceptions to the requirement of establishing a rate base, none of which were applicable to the petitioner.
In extending public utility statutes to solid waste collectors by the passage of the Solid Waste Utility Control Act, the Legislature in N.J.S.A. 48:13A-7[13] set forth a procedure for approval of solid waste collection contracts which carved out an exception to the general rule of N.J.S.A. 48:2-21.2. These statutes must be read in pari materia; it is entirely reasonable to assume that the Legislature must have had the earlier general act in mind when it adopted the later, more specific statute, and intended that the limitations in the former act should not apply to the latter. Kingsley v. Wes Outdoor Advertising Co., 55 N.J. 336, 339 (1970). In the normal course of events, the PUC may rely on the interactions of the market place to give rise to reasonable *26 rates. Where this competitive protection fails, the PUC in its discretion may require the contractor to demonstrate the reasonableness of its rates. See In the Matter of F.M. Leise, t/a Hudson Haulage Co., supra; In the Matter of Joseph P. Clancy, supra.
Finally, we turn to petitioner's assertion that scavenger service is not genuinely competitive, so that requiring a municipality to advertise for bids puts it to needless and pointless expense. While we sympathize with petitioner's individual difficulties, our concern in interpreting the statute must be to effectuate the public policy of the state as a whole. The Solid Waste Utility Control Act has been in effect too short a time for any significant results to have been observed. It is to be hoped that in future years the competitive nature of the scavenger service in petitioner's area will increase. Until that time, the Local Public Contracts Law provides two avenues of relief for a municipality that receives no competitive bids. N.J.S.A. 40A:11-5(3) authorizes the negotiation of contracts when advertising for bids on two successive occasions has been unsuccessful, and N.J.S.A. 40A:11-6, the successor to the statute which was actually used by petitioner in negotiating its original contract, provides for negotiation after passage of a resolution declaring an emergency. We do not consider that a requirement of advertising for bids, absent either of these sets of circumstances, will impose undue hardship on any New Jersey municipality.

II
From the foregoing it is apparent that policy considerations militate against petitioner's contention that the requirement of competitive bidding on solid waste collection contracts was abolished by the Solid Waste Utility Control Act. Petitioner's argument, however, is grounded primarily not in public policy but on its analysis of the relevant statutes.[14] *27 N.J.S.A. 40:66-4[15] mandates public bidding on all contracts made by municipalities for scavenger services of a value over $2,500. Petitioner offers two grounds for holding that this requirement is no longer in effect.
The first argument can be disposed of in short order. Saddle River argues that N.J.S.A. 40:66-4 was repealed by implication by the local Public Contracts Law, N.J.S.A. 40A:11-1 et seq. The latter statute, in its repealer section, N.J.S.A. 40A:11-38, expressly repealed N.J.S.A. 40:50-1, the earlier statute concerning municipal contracts. A number of other statutes were also expressly repealed, but N.J.S.A. 40:66-4 was not mentioned. According to standard principles of statutory construction, the existence of a specific repealer is considered to be evidence that the Legislature did not intend further repeals by implication. 1A Sutherland, Statutes and Statutory Construction § 23.11 at 235 (4th ed. 1972); Swede v. Clifton, 22 N.J. 303, 317 (1956). Petitioner asserts, however, that since N.J.S.A. 40:50-1, which was incorporated by reference into N.J.S.A. 40:66-4, was repealed, the latter statute was repealed also. In support of this dubious proposition, petitioner offers George Harms Excavating Co. v. Monroe Township Municipal Utilities Authority, 118 N.J. Super. 496 (Law Div. 1972). In that case, N.J.S.A. 40:14B-68, which by its terms exempted municipal utilities authorities from the coverage of Chapter 50 of Title 40 of the Revised Statutes, was held not to exempt such authorities from the broader coverage of the Local Public Contracts Law, which repealed Chapter 50. We do not consider that Harms supports petitioner's position; on the contrary, to the extent that the decision was *28 motivated by the consideration that the Local Public Contracts Law was intended to have wide applicability, it is authority for the opposite conclusion. In our view, the question of how N.J.S.A. 40:66-4 is to be read after the replacement of N.J.S.A. 40:50-1 by the Local Public Contracts law is definitively answered by N.J.S.A. 1:1-3.3:
Any reference in any statute to any other statute, which is revised by a revision law, shall, after the effective date of such revision law, be construed to be a reference to the section or sections, if any, of the revision law corresponding in substance to, or superseding, the section or sections of the statute so revised and so referred to.
Even were we to hold, however, that N.J.S.A. 40:66-4 had been repealed by implication in this way, petitioner would hardly be in a better position. The Local Public Contracts Law itself contains a provision, N.J.S.A. 40A:11-4, requiring competitive bidding on all municipal contracts over $2,500. Included in this category, of course, are solid waste collection services.
The second argument presents more difficulty. Petitioner asserts that since N.J.S.A. 48:2-13 and N.J.S.A. 48:13A-1 et seq. define solid waste collection as a public utility and place it under the jurisdiction of the PUC, contracts for this kind of service fall within the exception provisions of N.J.S.A. 40A:11-5(1)(f):
Any purchase, contract or agreement of the character described in section 4 of this act may be made, negotiated or awarded by the contracting unit without public advertising for bids and bidding therefor if
(1) The subject matter thereof consists of

......
(f) The supplying of any product or the rendering of any service by a public utility, which is subject to the jurisdiction of the Board of Public Utility Commissioners, in accordance with tariffs and schedules of charges made, charged or exacted, filed with said board,

......
As a result, petitioner concludes, N.J.S.A. 40:66-4, being apparently inconsistent with this section, is repealed by implication.
*29 We consider it probable that the exception section was intended to apply only to the other sections of the Local Public Contracts Law and not to independent statutes. It is not necessary to reach this question, however, for we cannot agree that solid waste collection contracts come within the language of the exception.
Petitioner argues that a scavenger's contract, filed with the PUC after it has been signed, constitutes a tariff in the sense intended by N.J.S.A. 40A:11-5(1)(f). We think, however, that there is a distinction between the terms "tariff" and "contract" as applied to public utilities. A tariff is a published schedule of rates, filed by a public utility, and thereafter, in the absence of successful challenge, applicable equally to all customers. Its application may or may not have been preceded by a rate-making hearing. As our Appellate Division has recently pointed out, such a tariff is not a mere contract. It is the law, and its provisions are binding on a customer whether he knows of them or not. Essex County Welfare Board v. New Jersey Bell Telephone Co., 126 N.J. Super. 417, 421-22 (App. Div. 1974). A contract, on the other hand, is an agreement individually negotiated between a utility and a particular customer, with rates that may differ according to circumstances. The distinction was well expressed by Mr. Justice Harlan in United Gas Pipe Line Co. v. Mobile Gas Service Corp., supra, 350 U.S. 332, 338-39, 76 S.Ct. 373, 378, 100 L.Ed. 373, 383-84 (1956):
In construing the [Natural Gas] Act, we should bear in mind that it evinces no purpose to abrogate private rate contracts as such. To the contrary, by requiring contracts to be filed with the [Federal Power] Commission, the Act expressly recognizes that rates to particular customers may be set by individual contracts. In this respect, the Act is in marked contrast to the Interstate Commerce Act, which in effect precludes private rate agreements by its requirement that the rates to all shippers be uniform, a requirement which made unnecessary any provision for filing contracts. [Citations omitted] The Commission in its brief recognizes this basic difference between the two Acts and notes the differing natures of the industries which gave rise to it. The vast number of retail transactions of railroads *30 made policing of individual transactions administratively impossible; effective regulation could be accomplished only by requiring compliance with a single schedule of rates applicable to all shippers [i.e., a tariff]. On the other hand, only a relatively few wholesale transactions are regulated by the Natural Gas Act.... Recognizing the need these circumstances create for individualized arrangements between natural gas companies and distributors, the Natural Gas Act permits the relations between the parties to be established initially by contract, the protection of the public interest being afforded by supervision of the individual contracts, which to that end must be filed with the Commission and made public.
In the same way, the New Jersey Public Utilities Act from its inception has contemplated that utilities may establish rates, in certain circumstances, by the negotiation of contracts wih individual customers; some instances have been noted earlier in this opinion (at 22-23).[16] It has been pointed out to us that the term "schedules of charges" used in N.J.S.A. 40A:11-5(1) (f) has long been administratively interpreted by the PUC to include such negotiated contracts. We are willing to accept this interpretation as correct, noting that both the hearing examiner and the Board apparently applied it in the present case. See also the construction of similar language in the Natural Gas Act, 15 U.S.C. § 717c(c), to include contracts with individual customers in *31 the "rates and charges" required to be filed with the Federal Power Commission. Sun Oil Co. v. Federal Power Commission, 266 F.2d 222, 224 (5th Cir.1959); Interstate Natural Gas Co. v. Southern California Gas Co., 209 F.2d 380, 384 (9th Cir.1953); Mississippi River Fuel Corp. v. Federal Power Commission, 121 F.2d 159, 164 (8th Cir.1941).
However, at the time of the passage of N.J.S.A. 40:50-1, the forerunner of N.J.S.A. 40A:11-5(1) (f), in 1957, solid waste disposal operations had not yet been designated as public utilities. The public utilities in New Jersey were then all of the "traditional" type. We must therefore decline to follow the hearing examiner and the Board in the conclusion that the term "schedules of charges" in N.J.S.A. 40A:11-5(1)(f) must be construed to include not only contracts negotiated by franchised public utilities, but also those negotiated by solid waste disposal utilities with an unrestricted territorial range. The legislative history on this issue indicates otherwise. The purpose of the bill, as described by Governor Meyner in his conditional veto of the original exceptions clause to N.J.S.A. 40:50-1, was as follows:
... the purpose of the sponsors of this bill was to clarify the advertising requirements where the service to be contracted for is the furnishing of electric, gas or similar service by a public utility authorized to furnish such service in the area, because in such case, since the rates charged are filed with the Board of Public Utility Commissioners, advertising for bids serves no useful purpose and causes needless expense. [Veto Messages of Governor Robert B. Meyner, 1957, at 10; emphasis added]
Where a public utility has been granted a franchise to serve a designated area, whether it sets its rates by tariff or by negotiated contract, advertising for competitive bids is of little avail since generally only one possible supplier of the service exists. The PUC unquestionably has the authority, under N.J.S.A. 48:13A-5, to allocate franchise areas to solid waste disposal and collection utilities. As yet, however, *32 it has not exercised this authority; hence all qualified utilities in this category are eligible to provide service to any municipality. In such a situation, competitive bidding may possibly result in considerable savings to the municipality and cannot be described as serving no useful purpose. We hold, therefore, that contracts negotiated with solid waste disposal and collection utilities do not at present fall under the exception of N.J.S.A. 40A:11-5(1)(f). If at some later time, the PUC elects to exercise its authority to the full extent conferred by the Legislature and designates franchise areas for solid waste utilities, competitive bidding will no longer serve any purpose and the exception to the bidding statute will come into play.
The Appellate Division, affirming the Board's decision, relied on the recent decision in Capasso v. Pucillo, 132 N.J. Super. 473 (App. Div. 1975), affirming 132 N.J. Super. 542 (Ch. & Law Div. 1974). While the context in which that case arose was somewhat different from that of the present one, the same issue of statutory construction was involved. We agree with the court in Capasso that "the legislative purpose was to limit the [exception] (i.e., N.J.S.A. 40A:11-5(1) (h))[17] to cases of services furnished by public utilities where advertising and competitive bidding served no purpose because the charges to be made were controlled by a schedule of tariffs filed with and approved by the Public Utility Commission." 132 N.J. Super. at 477-78.
Both considerations of public policy and accepted principles of statutory construction unite to convince us of the correctness of the Board's decision that the amended contract had been entered into improperly.
Affirmed.
SCHREIBER, J. (concurring).
The broad issue in this case is whether the Board of Public Utility Commissioners *33 (Board) has been vested with the same jurisdiction over public utility solid waste collectors, as it has over other public utilities, so that the Board may regulate the rates charged a municipality, whether by competitive bidding or some other appropriate method.
In my opinion the Legislature has vested that jurisdiction in the Board. It has the power and responsibility to decide when and under what circumstances competitive bidding is appropriate. The desired flexibility of empowering the Board to use its expertise, which it is gradually developing, to require competitive bidding or not, as the circumstances warrant, accords with the Legislature's intent in including solid waste collectors in the definition of "public utilities." N.J.S.A. 48:2-13.
Title 48 of the Revised Statutes delineates a comprehensive scheme of control over all public utilities. The basic grant of power to the Board is embodied in N.J.S.A. 48:2-13, which provides in part:
The board shall have general supervision and regulation of and jurisdiction and control over all public utilities ... and their property, property rights, equipment, facilities and franchises so far as may be necessary and for the purpose of carrying out the provisions of this Title.
It has been said that this statute gave the Board of Public Utility Commissioners a general jurisdiction over utilities "as far as it could be done by legislative act." State v. New York Central R. Co., 52 N.J. Super. 206, 208 (Ch. Div. 1958); Atlantic Coast Electric Ry. Co. v. Public Utility Board, 92 N.J.L. 168, 175 (E. & A. 1918), app. dism. 254 U.S. 660, 41 S.Ct. 10, 65 L.Ed. 462 (1920); O'Brien v. Public Utility Board, 92 N.J.L. 44, 46 (Sup. Ct. 1918), aff'd 92 N.J.L. 587 (E. & A. 1919); In re Central Railroad Co., 30 N.J. Super. 520, 523 (App. Div. 1954); Perth Amboy v. Bd. of Public Utility Comm'rs., 98 N.J.L. 106, 108 (Sup. Ct. 1922).
*34 In In re Public Service Electric and Gas Co., 35 N.J. 358 (1961), Justice Hall wrote:
Moreover, and of greater importance here, this State has delegated in most sweeping terms "general supervision and regulation of and jurisdiction and control over all public utilities" and "their property, property rights, equipment, facilities and franchises" to the Board. N.J.S.A. 48:2-13. More specifically, the Board is empowered to direct utilities to furnish safe, adequate and proper service, R.S. 48:2-23, and to that end it may fix just and reasonable standards and practices. R.S. 48:2-25. We find in these statutes, and throughout Title 48 of the Revised Statutes (1937), a legislative recognition that the public interest in proper regulation of public utilities transcends municipal or county lines, and that a centralized control must be entrusted to an agency whose continually developing expertise will assure uniformly safe, proper and adequate service by utilities throughout the State. Our courts have always construed these legislative grants to the fullest and broadest extent. [35 N.J. at 371; citations omitted].
In placing solid waste collection entities under the public utility law,[1] the Legislature found that waste collection is a matter of "grave concern to all citizens" and "is an activity thoroughly affected with the public interest; that the health, safety and welfare of the people of this State require efficient and reasonable solid waste collection, disposal and utilization service; that such service will more likely be achieved if the Public Utility Commission is charged with the duty of setting and enforcing standards and rates for regulating economic aspects of solid waste collection, disposal and utilization service; and that the exercise of any power herein provided for shall be deemed to be in the public interest and for a public purpose." N.J.S.A. 48:13A-2. Express provision was made for the Board to regulate solid waste collection rates, N.J.S.A. 48:13A-4, to designate their franchise areas to be served at charges "published in tariffs or contracts accepted for filing by the board," N.J.S.A. 48:13A-5 [emphasis supplied], and to issue to them certificates of public *35 convenience and necessity, a condition precedent to engaging in the business, N.J.S.A. 48:13A-6.
The Board's control over public utility solid waste enterprises, N.J.S.A. 48:2-13 et seq. and N.J.S.A. 48:3-1 et seq., complemented by provisions of the Solid Waste Utility Control Act of 1970, N.J.S.A. 48:13A-1 et seq., includes complete jurisdiction over the initial rates or charges made by solid waste collectors to municipalities in the same fashion that it has over other public utilities.[2]
The majority contends that a public utility solid waste collector which proposes to enter into a contract with a municipality is subject to competitive bidding because of N.J.S.A. 40:66-4 which reads as follows:
The governing body may, if it deem it more advantageous, contract with any person for the cleaning of the streets, or the collection, removal and disposal of ashes, garbage, refuse and waste matter or any portion thereof. Before making any such contract or contracts the governing body shall first adopt specifications for the doing of the work in a sanitary and inoffensive manner, and any such contract or contracts the amount of which exceeds $2,500.00 shall be entered into and made only after bids shall have been advertised therefor, and awarded in the manner provided in chapter 50 of this Title (§ 40:50-1 et seq.). The bidder or bidders to whom the contract or contracts shall be awarded shall give satisfactory bond or other security for the faithful performance of the work. The contract shall include and in all respects conform to the specifications adopted for the doing of the work.
The incorporation by reference of N.J.S.A. 40:50-1 eliminated public bidding "where the contract to be entered into is one for the supplying of any product or the rendering of any service by a public utility subject to the jurisdiction of the Board of Public Utility Commissioners of this State and tariffs and schedules of the charges made, charged or exacted *36 by the public utility for any such products to be supplied or services to be rendered are filed with the said board."[3]
Two requirements for exemption are: (1) the contracting company must be a public utility subject to the Board's jurisdiction, and (2) the product or service must be based on a tariff or schedule of charges which are filed with the Board. The solid waste collector Leone Brothers is admittedly a public utility subject to the Board's jurisdiction and its contract, which the majority recognizes is a schedule of charges, must be filed with the Board. N.J.A.C. 14:3-9.6.
The legislative history demonstrates the exemption was to be applied whenever the two criteria were satisfied. Initially when the Legislature adopted this exception (Assembly Bill 407) there was a blanket exception for public utilities irrespective of the service or product.[4] (Public utilities may and do engage in non-public utility activities). Governor Meyner conditionally vetoed the bill, Veto Messages of Governor Robert B. Meyner, 1957, p. 10, because:
I am advised that the purpose of the sponsors of this bill was to clarify the advertising requirement where the service to be contracted for is the furnishing of electric, gas or similar service by a public utility authorized to furnish such service in the area, because in such case, since the rates charged are filed with the Board of Public Utility Commissioners, advertising for bids serves no useful purpose and causes needless expense.
But the amendatory language in the bill would have a scope and effect beyond that intended. It would eliminate the advertising requirement in cases where the articles to be furnished or the service to be rendered are properly the subject of competitive bidding, merely because the contract is entered into with a public utility.
*37 The amendment clarified the Legislature's intent to limit the exemption to public utility products or services. The Hearing Examiner for the Board interpreted the statute in this manner. He concluded that "[t]he terms of such filed contract pertaining to services rendered and to be rendered and the consideration to be paid therefor are considered by the Board to constitute `tariffs and schedules of charges made, charged or exacted' for such services" and therefore the contract was exempt from the mandatory bidding requirements. (Hearing Examiner's Report and Recommendations, Dkt. No. 734-331, November 21, 1973). In its opinion the Board did not disagree, but stated it was bound by the decision in Capasso v. Pucillo, 132 N.J. Super. 542 (Ch. & Law Divs. 1974), aff'd 132 N.J. Super. 473 (App. Div. 1974).
In Capasso the Court concluded that a conflict existed between N.J.S.A. 40:66-4 which required competitive bidding and N.J.S.A. 40A:11-5(1) (f) which exempted public utility services from competitive bidding. After finding that N.J.S.A. 40:66-4 was not repealed by implication and that it applied to public utility solid waste collection enterprises, the decisions attempted to harmonize both statutory provisions. But the need for that strained interpretation of N.J.S.A. 40A:11-5(1) (f) and consideration of the implied repeal of N.J.S.A. 40:66-4 are dissipated once it is recognized that N.J.S.A. 40:66-4 is applicable and viable for non-public utility operations.
The crux of the majority's misinterpretation of the plain and unambiguous language of both N.J.S.A. 40:50-1 and its successor, N.J.S.A. 40A:11-5(1) (f), is predicated on the thought that the statutory exemption was limited to public utilities which have "a franchise to serve a designated area." Supra at 31. Public utilities in New Jersey do not have exclusive franchise areas. See N.J.S.A. 48:9-5 and N.J. Const., Art. 4, § 7, par. 9(8).[5] The 1962 revision of the public *38 utility law substantially eliminated the concept of limiting the authority of utilities to serve a particular area[6] and many public utilities have authority to operate throughout the State.[7] As the majority has stated New Jersey "has long since abandoned the view that the concept of a public utility must entail `a locked-in consumer group receiving a necessity of life through a monopolistic supplier.' In re Petition of New Jersey Natural Gas Co., 109 N.J. Super. 324, 333 (App. Div.), certif. den. 56 N.J. 475 (1970)." Supra at 21. Competition among public utilities for the same consumer has existed for many years. Two gas companies have distributed gas on the same street within the same municipality. Atlantic City Gas & Water Co. v. Consumers' Gas & Fuel Co., 70 N.J. Eq. 536 (Ch. Div. 1905), aff'd 74 N.J. Eq. 455 (E. & A. 1908). Two competing telephone companies at one time served between Camden and Cape May Court House. Two bus companies have had routes which coincided in whole or in part. The same situation has existed with railroads. The unambiguous statutory language should not be artificially modified because of a legislative history which does not clearly support a mythical legal concept.[8]
*39 The Hearing Examiner and the Board believe that the competitive bidding practice as provided for in N.J.S.A. 40:66-4 is salutary at this time for solid waste companies and no one quarrels with its wisdom in that respect. The Board is free to adopt those provisions, as it impliedly has, by not exercising jurisdiction before competitive bidding has occurred and the contract entered into. Undoubtedly the Board has been reluctant because of the Capasso decision to adopt a specific regulation to that effect, although unquestionably that would be the better practice.
I would affirm the judgment, but find that the Board has jurisdiction over the subject matter.
SCHREIBER, J., concurring in the result.
For affirmance  Chief Justice HUGHES, Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD and SCHREIBER and Judge CONFORD  7.
For reversal  None.
NOTES
[1] The governing body may, if it deem it more advantageous, contract with any person for the cleaning of the streets, or the collection, removal and disposal of ashes, garbage, refuse and waste matter or any portion thereof. Before making any such contract or contracts the governing body shall first adopt specifications for the doing of the work in a sanitary and inoffensive manner, and any such contract or contracts the amount of which exceeds $2,500.00 shall be entered into and made only after bids shall have been advertised therefor, and awarded in the manner provided in chapter 50 of this Title (§ 40:50-1 et seq.). The bidder or bidders to whom the contract or contracts shall be awarded shall give satisfactory bond or other security for the faithful performance of the work. The contract shall include and in all respects conform to the specifications adopted for the doing of the work. [N.J.S.A. 40:66-4]
[2] Under N.J.S.A. 40:50-1, the statute concerning municipal contracts that was then in effect, passage of such a resolution was a prerequisite to entering upon a contract without having first advertised for bids.
[3] The act became effective on November 6, 1970, six months after its passage.
[4] This statute, N.J.S.A. 40A:11-1, et seq., which went into effect on July 1, 1971, was a comprehensive revision of the earlier statutes dealing with municipal and county contracts, among them N.J.S.A. 40:50-1, which it expressly repealed. N.J.S.A. 40A:11-38. Further extensive amendments went into effect on March 3, 1976. L. 1975, c. 353. But see L. 1976, c. 25.
[5] After the adverse decision of the Board, petitioner advertised for bids on a solid waste collection contract and received one response, from Leone Brothers. A contract was accordingly entered into on May 20, 1974 and is now operative. The case was not rendered moot, however, since there remains for determination the issue as to whether Leone's compensation for the period from May 1, 1973 to April 30, 1974 should be fixed by the terms of the original contract following the adoption of the "emergency" resolution or by the terms of the amendment filed with the board. Petitioner has paid Leone Brothers at the amended rate, with an agreement that Leone will reimburse all payments in excess of the original contract rate in the event the amended contract is disapproved.
[6] Health and environmental aspects of solid waste collection and disposal are extensively regulated by the Department of Environmental Protection under powers delegated to it by the Solid Waste Management Act, N.J.S.A. 13:1E-1 et seq.
[7] See, e.g., New Jersey State Commission of Investigation, A Report Relating to the Garbage Industry of New Jersey (October 7, 1969); Frederick B. Lacey, U.S. Attorney for the District of New Jersey, Recommendations to the 1970 Session of the Legislature Concerning Legislation Whigh Might Be Enacted to Curb the Power and Influence of Organized Crime in New Jersey (January 20, 1970) at 45-46.
[8] See, for example, United Gas Pipe Line Co. v. Mobile Gas Service Corp., 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1955) (natural gas); Federal Power Commission v. Sierra Pacific Power Co., 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1955) (electric power).
[9] a. The board, upon complaint or its own initiative, after hearing, may direct any person engaging in the solid waste collection business or the solid waste disposal business to furnish proof that the charges or rates to be received for such service do not exceed just and reasonable rates or charges for such service.

b. Should the board find that the rates or charges are excessive then it may order the person charging such excessive rates or charges to make an adjustment in the contract to a sum which shall result in just and reasonable rates or charges. [N.J.S.A. 48:13A-7]
[10] See, for example, Hillside Township v. Sternin, 25 N.J. 317, 322 (1957); Terminal Construction Corp. v. Atlantic City Sewerage Authority, 67 N.J. 403, 409-10 (1975); Veto Message of Hon. William T. Cahill concerning Senate Bill No. 627 (1970-71 at 150); Veto Message of Hon. Richard J. Hughes concerning Senate Bill No. 284 (1969).
[11] We note, for instance, the explicit reference to bidding in N.J.S.A. 48:13A-10(c):

No municipality may require a public utility engaged in the solid waste collection business ... to submit to any prequalification test before permitting it to bid on a contract or before the employment of a solid waste collection ... contractor.
[12] It should be noted that a regulatory agency's power to modify the terms of a contract may usually be exerted only to protect the public interest, and not to release the contracting utility from a disadvantageous bargain. Federal Power Commission v. Sierra Pacific Power Co., supra, 350 U.S. 348, 354-55, 76 S.Ct. 368, 100 L.Ed. 388, 394-95 (1956). Review by the PUC thus could not normally deprive a municipality of low rates offered by a utility under the pressure of competition.
[13] This provision is set forth at note 9, supra.
[14] It should be noted that petitioner's interpretation was accepted by both the hearing examiner and the Board of Public Utility Commissioners, although the Board, considering itself bound by the contrary reasoning of the Chancery Division, declined to act upon it. Since the statutory language is quite evidently capable of creating some confusion, we address ourselves in some detail to its analysis.
[15] This provision is set forth at note 1, supra.
[16] The PUC's regulations for filing such contracts are set forth in N.J.A.C. 14:3-9.6:

Rates; difference from filed tariff
(a) In every instance where a utility, subject to the jurisdiction of the Board, enters into a contract or agreement with a customer for the sale of its service at rates different from those provided in the existing tariffs of the utility on file with the Board, it shall file four copies of such contract or agreement....
(b) The filing is to be accompanied by a detailed statement as to the:
1. Type of agreement; for example, firm or interruptible service;
2. Detail costs to the company associated with delivery and sale of the service;
3. Rates and other charges to the customer;
4. Effect on the company's income of such sale;
5. Reasons for the contract or agreement.
[17] Now N.J.S.A. 40A:11-5(1)(f).
[1] Solid Waste Utility Control Act of 1970, N.J.S.A. 48:13A-1 et seq.
[2] Jurisdiction over health and environmental impacts has been placed in the Department of Environmental Protection. The only limitation on the public utility board jurisdiction involves some health and environmental matters delegated to the Department of Environmental Protection. N.J.S.A. 13:1E-1 et seq.
[3] The reference in N.J.S.A. 40:66-4 to N.J.S.A. 40:50-1 et seq. has been amended because of a general revision of N.J.S.A. 40:50-1 et seq. to refer to N.J.S.A. 40A:11-1 et seq. N.J.S.A. 1:1-3.3. The exemption provison is now found in N.J.S.A. 40A: 11-5(1) (f) and reads substantially the same as in N.J.S.A. 40: 50-1.
[4] Id.
[5] Under N.J.S.A. 48:13A-5 of the Solid Waste Utility Control Act of 1970 the Board is empowered to fix a franchise area for one or more solid waste collection and disposal entities. There is not now nor has there been any such provision for any other public utilities.
[6] N.J.S.A. 48:9-1 to -4 (gas) were repealed by L. 1962, c. 198, § 198; N.J.S.A. 48:7-1 and -2 (electric) were revised; N.J.S.A. 48:19-1 to -4 (water) were repealed by L. 1962, c. 198, § 198.
[7] Public Service Electric and Gas Company, the largest "traditional" utility, has historically asserted authority to operate anywhere in the State.
[8] See Service Armament Co., et al. v. Hyland, 70 N.J. 550 (1976) where this Court has reiterated the rule that the "overriding principle in statutory construction is that in the absence of an explicit indication of special meaning, words will be given their ordinary and well-understood meaning." [Supra at 556].

The majority impliedly concedes that if the Board designates franchise areas, then the statutory competitive bidding requirements of N.J.S.A. 40:66-4 will be inapplicable. [Supra at 31]. Under N.J.S.A. 48:13-5 the Board may grant a number of companies the same franchise area and N.J.S.A. 40:66-4 would not apply. It is difficult to believe that the Legislature intended this anomalous result.