691 A.2d 846

IN THE MATTER OF THE PETITION OF THE COUNTY OF ESSEX (1) FOR APPROVAL AND CONTINUATION OF INTERIM SOLID WASTE DISPOSAL RATES; AND (2) FOR APPROVAL OF A CUBIC YARD CONVERSION RATION OF 3:1.

Superior Court of New Jersey
Appellate Division

Argued January 21, 1997—Decided April 10, 1997.

Before Judges PETRELLA, WALLACE and KIMMELMAN.

*I. Leo Motiuk,* argued the cause for Solid Waste Transfer and Recycling Inc., appellant/cross-respondent in A–351–94T3 and respondent in A–522–94T1 (*Shanley & Fisher,* attorneys; *Mr. Motiuk* and *Joseph M. Cerra,* on the brief).

*Sandra T. Ayres* argued the cause for Waste Management of New Jersey, appellant in A–522–94T1 and respondent in A–351–94T3 (*Schwartz, Tobia & Stanziale, P.A.,* attorneys; *Ms. Ayres,* on the brief).

*Carla V. Bello,* Senior Deputy Attorney General, argued the cause for Department of Environmental Protection and Energy, respondent in A–351–94T3 and A–522–94T1 (*Peter Verniero,* Attorney General, attorney; *Andrea M. Silkowitz,* Assistant Attorney General, of counsel; *Ms. Bello,* on the brief).

*Benjamin Clarke* argued the cause for County of Essex, respondent in A–351–94T3 and A–522–94T1 (*DeCotiis, Fitzpatrick & Gluck,* attorneys; *Eric D. Wisler,* of counsel; Mr. *Clarke* on the brief).

*William J. Schwartz,* Assistant Corporation Counsel, argued the cause for City of Newark, intervenor-respondent/cross-appel-

lant in A–351–94T3 and A–522–94T1 (*Michelle Hollar–Gregory,* Corporation Counsel, attorney; *Mr. Schwartz,* on the brief).

*Department of the Public Advocate,* attorney for Division of Rate Counsel, respondent in A–351–94T3 and A–522–94T1 (*James McGuire,* of counsel and on the brief).

KIMMELMAN, J.A.D.

The appeal from the August 23, 1994, final order of the Department of Environmental Protection and Energy (DEPE) by Waste Management of New Jersey, Inc., (WM) under Docket No. A–0522–94T1 and the appeal and cross-appeal of the same order by Solid Waste Transfer and Recycling, Inc., (SWTR) and the City of Newark, respectively, under Docket No. A–0351–94T3 have been consolidated for the purpose of this opinion.

The principal legal issue involved in both appeals focuses upon the propriety of applying automatic annual incremental increases, based upon the Consumer Price Index (CPI), to the rates being charged Essex County (Essex or County) by WM and SWTR, the operators of two solid waste transfer stations in the City of Newark (Newark). Analysis of this issue depends upon whether interim acceptance, under emergency conditions, by the Board of Public Utilities [1] (Board) of the contracts entered into by WM and SWTR with the County for the operation of the transfer stations

---

[1] On August 19, 1991, the Board of Public Utilities was redesignated as the Board of Regulatory Commissioners, and at the same time, the Department of Environmental Protection (DEP) became the Department of Environmental Protection and Energy. *See N.J.S.A.* 13:1D–1 (1991) which sets forth in full Reorganization Plan No. 002–1991. On July 4, 1994, the Department of Environmental Protection and Energy was renamed the Department of Environmental Protection, and the Board of Regulatory Commissioners was redesignated the Board of Public Utilities pursuant to Reorganization Plan No. 001–1994. *See N.J.S.A.* 13:1D–1 (West Supp.1996).

During the course of the administrative proceedings below, between the dates of August 19, 1991, and July 4, 1994, the Department of Environmental Protection and Energy (DEPE) took over duties of the Board. The proceedings resulting in the final order under appeal, dated August 23, 1994, were commenced during the interval when the DEP functioned as the DEPE.

should be construed as having firmly resolved the enforceability of the CPI-based automatic rate increase clause in each contract. Other issues involve whether SWTR is entitled to compensation due to solid waste tonnage shortfalls and whether WM is entitled to interest on claims against the County resolved in its favor for $4,841,930 in tonnage shortfall adjustments and for $1,065,746 in landfill taxes paid by it.

I

By way of background, it appears that for many years, solid waste emanating from Essex County and other adjacent northern New Jersey counties had been disposed of at landfills located in the Hackensack Meadowlands (Meadowlands) and operated by the Hackensack Meadowlands Development Commission. As the Meadowlands neared its capacity, the counties using its facilities were directed to make alternative arrangements.

In earlier litigation, a court order was entered in 1982, and amended in 1983, requiring Essex County to cease all use of the Meadowlands landfill facilities after July 31, 1987. It was contemplated that the County would develop and construct a resource recovery facility for its waste and that such facility would be operational on or about the January 31, 1987, cut-off date. Unfortunately, the construction plans for the County's resource recovery facility were delayed and the facility was not scheduled to be operational until sometime in 1990. Because the Meadowlands landfills were to close on July 31, 1987, the County proposed an emergency interim plan whereby it would undertake to solicit companies engaged in solid waste collection and disposal who would be interested in the construction and operation of temporary transfer stations, that is, facilities where collection trucks empty their loads of solid waste for loading onto larger trucks or railway cars and transfer to out-of-state disposal sites.

In December 1986, the County issued a solicitation of interest seeking proposals for the establishment of one or more solid waste stations to operate on an interim basis for approximately three

years until the County's resource recovery facility became operational. It was noted that any proposed transfer station would need DEP approval and that the rates or tariffs to be charged would need approval by the Board. Approximately 100 solicitations were mailed out to prospective operators and advertisements were placed in trade journals as well as in the *Star Ledger*. Nine companies responded and ultimately the responses were narrowed down to two companies based on suitability of the site proposed, access to transportation networks, and readiness of structures already in place at the sites. The County informed the DEP of the preferential proposals submitted by WM and SWTR.

At the behest of the DEP and the County, Governor Kean issued an emergency declaration which enabled the DEP to circumvent the lengthy process for initiating transfer station approval. The DEP was then able to issue the necessary performance permits so that WM and SWTR could operate as licensed handlers of solid waste. Meanwhile, the County had commenced extensive contract negotiations with WM and SWTR and settled upon three solid waste transfer sites, two in Newark and one in Orange. At a later date, the site in Orange was eliminated because the solid waste capacity was adequate at the two Newark sites. The tariff rates to be charged by WM and SWTR for each ton of waste received were finally settled upon and each appellant executed a detailed written agreement with the County on July 1, 1987. Specific provisions of each contract such as the automatic CPI-based escalator clause and the standard clause that each contract was to be governed and construed pursuant to the laws of the State of New Jersey are the principal focus of this appeal.

The contracts were awarded and executed by the County not as a result of competitive bidding normally required by the Local Public Contracts Law (LPCL), *N.J.S.A.* 40A:11–1 to 40A:11–49, but rather under the emergency bidding exception contained in *N.J.S.A.* 40A:11–6. Newark immediately filed a complaint in lieu of prerogative writs in the Law Division challenging the construction and operation of the two waste transfer facilities by WM and

SWTR, contending that the July 1, 1987, transfer station contracts were void because they were not awarded in compliance with the public bidding provisions of the LPCL. Newark's position was that the County was not entitled to invoke the emergency public health, safety, or welfare provisions of *N.J.S.A.* 40A:11–6 because the County had intentionally created the emergency by not earlier resolving the problem of lack of solid waste facilities. On the return date of an order to show cause, the Law Division judge refused to restrain the continued construction of the transfer stations but, on motion of the DEP and because a final administrative order was involved, did transfer the matter to the Appellate Division. In a very thorough opinion by Judge Dreier which recounted the historical background of this matter, this court held that WM's and SWTR's contracts with the County were lawfully negotiated and awarded pursuant to the emergency bidding exception of the LPCL. *See Newark v. Essex County Bd. of Chosen Freeholders,* 221 *N.J.Super.* 558, 535 *A.*2d 517 (App.Div.1987).

The two transfer stations located in Newark were constructed and became operational on time but are no longer in use.

## II

Initial regulatory approval was sought when, on July 16, 1987, the County filed an application with the Board for Certificates of Public Convenience and Necessity for three solid waste transfer stations (later amended to include only the two stations in Newark). The County further sought approval of the contracts it had entered into with WM and SWTR and sought approval of the tariff rates representing the charges to the County as set forth in such contracts. This expedited interim approval was requested because of the approaching July 31, 1987, Meadowlands closure deadline.

The Board held a public hearing on July 28, 1987, and, on July 31, 1987, ordered that Certificates of Public Convenience and Necessity be issued to the County and sub-certificates be issued to WM and SWTR for the transfer stations involved. In the same

order, the Board emphasized the "emergent nature" of the County's petition and said "the Board *HEREBY ACCEPTS* the Contracts [between the County and WM and SWTR] . . . ." The Board approved, on an "interim, initial, emergent" basis, the tariff rates submitted by the County and specifically provided:

"Operations authorized herein are subject to the rights and duties of public utilities as set forth in Title 48 *New Jersey Statutes Annotated* and the *New Jersey Administrative Code* applicable to public utilities."

On February 4, 1988, the County filed a supplemental petition with the Board for final approval of the interim initial tariff rates "subject to this Board's continuing rate-making review and jurisdiction. . . ." On May 2, 1988, the Board transferred the matter to the Office of Administrative Law (OAL) as a contested case. In that proceeding, Newark sought to compel WM and SWTR to respond to discovery requests but the Administrative Law Judge (ALJ) ruled that WM and SWTR were not parties to the proceeding and should not be joined. Consequently, an interlocutory application was made by Newark to have the Board review the ALJ's ruling.

On August 5, 1988, the Board, by an order signed by its then president, Christine Todd Whitman, joined WM and SWTR as parties in the case and made clear that it regarded WM and SWTR and the transfer stations operated by these appellants to be public utilities. The order was significant and far reaching for the purposes of this appeal and provided, in pertinent part, as follows:

The solid waste disposal rates which Essex seeks to have approved are based almost entirely upon the service fees or charges to Essex contained in certain lengthy contracts between it and the respective Transfer Stations pursuant to which the Transfer Stations furnish solid waste disposal service to Essex.

. . . .

The contracts are complex. They were negotiated in reliance upon the emergency provisions of the Local Public Contracts Law, *N.J.S.A.* 40A:11-1, *et seq.* . . .

. . . .

The rates in question are "initial rates" and as such did not and do not require hearings to become effective. However, as indicated by the Board at its hearing concerning the petition of Essex held July 28, 1987, further hearings would be held in the future to consider the reasonableness of any rate that would be set. And, as

stated by the Board in its Order of July 31, 1987, the rates were approved by the Board as "interim, initial emergent tariff rate(s)" on an "interim and subject to refund" basis. The Board, therefore, clearly indicated in the hearing and in the Order that the rates would be subject to subsequent hearing and scrutiny and, if warranted, refund. To achieve such scrutiny the Board transmitted the petition for their final approval to the Office of Administrative Law (OAL) for hearings and examination with respect to the reasonableness thereof.

Approximately 98% of the rates is made up of the monies paid by Essex to the Transfer Stations pursuant to said contracts. If the contracts, and the charges to Essex made thereunder, are considered sacrosanct or unreviewable by the Board, as Waste Management would have it, there can be no effective examination of Essex's solid waste disposal rates. This is not what the Board intended, and not what the public good requires.

In her July 12, 1988, memorialization [sic] of the ruling under interlocutory review, the ALJ correctly inferred that the Board has deemed the Transfer Stations to be public utilities subject to its general jurisdiction under *N.J.S.A.* 48:2–13. Any solid waste facility, including a transfer station, constructed or operated pursuant to the provisions of the Solid Waste Management Act, *N.J.S.A.* 13:1E–1, *et seq.*, shall be deemed a public utility and shall be subject to the rules and regulations of the Board. *N.J.S.A.* 13:1E–27. The Transfer Stations each hold a Certificate of Public Convenience and Necessity to engage in the business of solid waste disposal and, if [sic] fact, are so engaged. It would be unlawful for them to be engaged in the solid waste disposal business unless they held certificates. *N.J.S.A.* 48:13A–6.

In light of these statutes the argument of Waste Management that it did not seek a Sub–Certificate to engage in solid waste disposal, that it did not and does not consider itself a public utility and that it is a "private vendor", rather than a public utility, is of no consequence. As public utilities, the Transfer Stations must bear the burden of justifying the reasonableness of their rates, i.e., the service fees and charges to Essex under the contracts. *Central R. Co. of N.J. v. Dept. of Public Utilities,* 7 *N.J.* 247, 81 *A.*2d 162 (1951). Such contracts, although their provisions were agreed upon by the Transfer Stations and Essex, are nevertheless subject to modification by the Board in the public interest. When the state, through the Board, exercises its soverign [sic] power over rates, the contract rights of the parties must yield. *Application of Borough of Saddle River,* 71 *N.J.* 14 (1976) at p. 23 [362 *A.*2d 552].

. . . .

In this proceeding complete relief, i.e., a determination of the reasonableness of the interim, emergent, initial rates charged by Essex for solid waste disposal and, if warranted, a refund of a part of such rates, cannot be accorded among those already parties, i.e., Essex, Newark and other municipalities, the Department of the Public Advocate, Division of Rate Counsel, and Board Staff, unless the Transfer Stations are joined as parties. It is the Transfer Stations and the Transfer Stations alone, that possess most if not essentially all of the information needed to determine the reasonableness of the rates; the service fees or charges to Essex under said contracts comprise nearly the whole of the rate which is in turn

charged by Essex to the people of Essex County for solid waste disposal. Under such circumstances we cannot blindly accept such fees and charges as a given.

WM sought a stay of the Board's August 5, 1988, ruling and sought an administrative hearing regarding its status as a public utility. On September 14, 1988, the Board denied such requests.

Shortly thereafter, the County filed with the Board a supplement to its tariff rate petition which was pending before the OAL whereby the County sought to include in its rates a CPI-based escalator clause increase of 5.36% which WM had requested pursuant to Article V B(3) of its July 1, 1987, transfer station contract with the County. The contractual provision relating to the CPI-based increase provided:

> The Service Fee for Acceptable Waste ... shall be increased each Contract Year to reflect 106% of the percentage increase since January 1 of the preceeding [sic] year in the CPI–U for New York/Northern New Jersey ....

The County took the position that Board approval was needed because no service fee increase could be paid by it to WM, except from tipping fees which also are required to be approved by the Board. Concurrently, Newark sought from the Board a declaratory order that no adjustments in tipping fees, rates, or charges could be made without prior authorization and approval by the Board.

On January 4, 1989, the Board addressed the CPI issue by clarifying its prior order of July 31, 1987, as follows:

> Upon review of the above language, we see that its [sic] raises the question of whether the Board's "acceptance" of the contract between Waste Management and Essex constituted not only an acceptance of Waste Management's initial service fees to Essex provided for therein but also an acceptance of increases in the service fees or charges based upon the CPI escalator clause of the contract, Article V, paragraph B.(3).
>
> ....
>
> The Board's acceptance of Essex's contracts with the Transfer Stations and, by implication, the service fees or charges therein, was "based upon ... the emergent nature" of Essex's petition. Under such circumstances, while not as clearly spelled out in our Order of July 31, 1987, as in retrospect it might have been, our acceptance of the contracts was, as in the case of Essex's rates, on an "interim, initial basis."
>
> The Board has not yet made a determination of the reasonableness of Waste Management's interim, initial service fees. Until such time as they and the CPI

escalation clause have been found to be reasonable the fees cannot be increased pursuant to that clause.

The Board then transferred the County's supplemental petition to the OAL to be made part of the rate proceeding. Subsequent requests to the County for CPI-based increases were made by both WM and SWTR. The County, in turn, filed further supplemental petitions for approval of the CPI-based increases.

WM sought a rehearing of the January 4, 1989, decision of the Board claiming (1) that the Board had engaged in retroactive rate making in rejecting the CPI-based automatic increases in contract rate charges and (2) that WM was not a public utility but merely a contract vendor. The Board denied the request for a rehearing. WM sought leave to appeal and, ultimately, on June 27, 1989, the Supreme Court denied leave to appeal.

In an initial decision issued December 31, 1990, the ALJ upheld the July 1, 1987, contracts between the County and WM and SWTR and ruled that the contracts were negotiated at arm's length in a competitive market, were reasonable, and, that by reason thereof, the automatic CPI-based escalator clauses were enforceable.

By order entered August 8, 1991, the Board modified the ALJ's initial decision and held that the contracts were not the result of arm's-length negotiations in a competitive market. It determined that the negotiated contract rates approved as interim rates in its July 31, 1987, order were reasonable and would be allowed as final rates. Nevertheless, the Board concluded that the CPI-based automatic increases were not enforceable and said:

> [T]here are fundamental problems involved with linking rate increases at solid waste transfer stations to the CPI. The major components of transfer stations costs are depreciation, landfill disposal costs, transportation costs, return on investment and salaries. *These cost components do not automatically increase at the same rate as the CPI.* The record presented by the petitioners did not demonstrate a nexus between anticipated changes in transfer station operating costs and the CPI.
>
> [(Emphasis added).]

By way of further illustration, the Board made reference to safeguards it had built into prior cases in which escalator clauses had been permitted:

[I]n *In the Matter of the Application of SES Gloucester,* BPU, Docket No. SE85100984, a case cited in support of the CPI-linked increases, we accepted a Producer Price Index based escalation clause *only* after it was tied to a rate base/rate of return analysis and *coupled* with an ongoing annual earnings review. We also note that there exist escalator clauses in other contracts reviewed by this Board (e.g. contracts for resource recovery plants) but that such escalator clauses are tailored to reflect the type of costs associated with the particular operation. Thus, a "weighted" or "blended" escalation formula, which takes into consideration a variety of financial indices relevant to the subject matter under review, provides the necessary assurance of reasonableness in such circumstances.

Absent such safeguards, sound regulatory policy and law militates against automatic rate increase based upon CPI escalators. *The CPI reflected inflation in such areas as food, housing and electronic goods, and thus bears little relationship to increases in costs in the solid waste industry. Reflecting this policy, the Board has "consistently refused to recognize increases associated with general inflationary factors." See Petition of Elizabethtown Water Company,* 11 *N.J.A.R.* 303, 337 (N.J.B.P.U. 1984), *reversed on other grounds,* 205 *N.J.Super.* 528 [501 *A.*2d 567] (App.Div.1985), *affirmed as modified,* 107 *N.J.* 440 [527 *A.*2d 354] (1987). *See Re Jersey Central Power & Light Company,* 65 PUR 4th 175 (N.J.B.P.U.1985); *Re Commonwealth Water Co.,* 7 PUR 4th 456 (N.J.B.P.U.1974); *In re Otter Tail Power Co.,* 21 PUR 4th 254 (S.D.P.U.C.1977) "The effects of inflation on a company do not in any reasonably accurate manner parallel those contained in the [CPI]."

[ (Emphasis added).]

In light of these concerns and in the absence of a record supporting the relationship between the automatic CPI-based increases and costs associated with transfer station operation, the Board rejected the ALJ's acceptance of CPI-based automatic increases, and concluded:

[B]ecause the transfer stations failed to create a record that would support an automatic rate increase tied to a consumer price index, or in the alternative, demonstrate known and measurable cost increases which could reasonably be foreseen, the transfer stations are not entitled to approval of the CPI-linked rate increases and we *REJECT* the ALJ's acceptance of such increases.

[(Emphasis added).]

Both WM and SWTR sought a reconsideration of the Board's August 8, 1991, order which modified the ALJ's initial decision. In the meantime, the County and WM reached a settlement agreement in which the County agreed to pay WM $8,000,000 in settlement of its claims for tonnage shortfall and for increased

costs due to Pennsylvania surcharge claims, together with interest. The timing and method of payment were left open.

On November 13, 1992, the DEPE [2] granted WM's and SWTR's motions for reconsideration of the Board's August 8, 1991, modification of the ALJ's initial decision. The DEPE concluded that the settlement reached between the County and WM had to be submitted to the DEPE for review and approval. It acknowledged that it would reconsider the Board's August 8, 1991, order rescinding the ALJ's allowance of the CPI-escalator clause and such other issues that had been raised by the parties before the Board.

### III

On August 23, 1994, the Commissioner of the DEPE issued the final decision on reconsideration. The DEPE differed with the Board and found that the July 1, 1987, operating contract with WM and SWTR had indeed been the result of arm's-length, competitive negotiations but concluded that such finding did not detract in any way from its regulatory jurisdiction to modify the contracts so as to eliminate the CPI clauses. The DEPE affirmed the Board's rejection of the automatic CPI-based rate escalator for the key reason that the major components of transfer station costs bore no relationship to the components of the CPI. It stated:

Only when an automatic adjustment clause has been specially selected to reflect the type of costs under review, has its use been permitted.... [T]he CPI clauses here: (1) were not tailored in any way to reflect transfer station costs and (2) were not subject to any further ratemaking review or analysis.

The DEPE rejected the $8,000,000 settlement between the County and WM and, instead, granted to WM $4,841,930 in shortfall tonnage adjustments over the length of its contract and $1,065,746 in landfill taxes, although it rejected WM's claim of prejudgment interest on those amounts. The DEPE also rejected SWTR's claim for additional payments arising from landfill tax

---

[2] By this point, the DEPE had succeeded to the solid waste regulatory functions formally vested in the Board.

surcharges and tonnage shortfall because SWTR's contract with the County failed to contain a specific guaranty that was relevant to the issue. The DEPE reasoned:

[T]he SWTR and WM contracts treated this issue differently. Whereas the WM contract obligated the County to direct a minimum tonnage to the facility ("Guaranteed Tonnage") the SWTR contract merely set different rates which varied upon the average daily tonnage and were subject to correction in two six-month increments.

Both WM and SWTR appeal the DEPE's August 23, 1994, final decision which modified the Board's August 8, 1991 order. WM's Law Division action to enforce the $8,000,000 settlement with the County brought prior to the DEPE's final decision was transferred to this court and has been subsumed within the issues on these appeals.

## IV

In our consideration of the merits of these appeals, we recognize that appellate courts have a limited and structured role in reviewing the decisions of administrative agencies. We will not reverse an agency decision unless it is "arbitrary, capricious, or unreasonable or is not supported by substantial credible evidence in the record as a whole." *Dennery v. Bd. of Educ.*, 131 *N.J.* 626, 641, 622 *A.*2d 858 (1993). If we find sufficient credible, competent evidence in the record to support the agency's conclusion, we are bound to uphold the agency's findings. *See Goodman v. London Metals Exch., Inc.*, 86 *N.J.* 19, 28–29, 429 *A.*2d 341 (1981). Moreover, decisions of administrative agencies such as the DEPE carry with them a "strong presumption of reasonableness[.]" *See Newark v. Natural Resource Council in the Dep't of Envtl. Protection*, 82 *N.J.* 530, 539, 414 *A.*2d 1304 (1980), *cert. denied*, 449 *U.S.* 983, 101 *S.Ct.* 400, 66 *L.Ed.*2d 245 (1980). Where expertise of the administrative agency is a pertinent factor, we must accord the agency due regard in that respect. *Close v. Kordulak Bros.*, 44 *N.J.* 589, 599, 210 *A.*2d 753 (1965); *In re Boardwalk Regency Corp.*, 180 *N.J.Super.* 324, 333–35, 434 *A.*2d 1111 (App.Div.1981). We may not vacate an agency's determination merely because of

doubts as to its wisdom or because the record may support more than one result. *See generally Henry v. Rahway State Prison*, 81 *N.J.* 571, 579–80, 410 *A*.2d 686 (1980). Consequently, "it is not our function to substitute our independent judgment for that of an administrative body, ... where there may exist a mere difference of opinion concerning the evidential persuasiveness of the relevant proofs. As a reviewing court, we will not weigh the evidence, determine the credibility of witnesses, draw inferences and conclusions from the evidence, or resolve conflicts therein." *De Vitis v. New Jersey Racing Comm'n*, 202 *N.J.Super.* 484, 489–90, 495 *A*.2d 457 (citations omitted), *certif. denied*, 102 *N.J.* 337, 508 *A*.2d 213 (1985).

## V

Both WM and SWTR, each as the owner and operator of a solid waste transfer station, fall squarely within the definition of a public utility. *N.J.S.A.* 48:2–13 provides in pertinent part:

> The term "public utility" shall include every individual, copartnership, association, corporation or joint stock company, their lessees, trustees or receivers appointed by any court whatsoever, their successors, heirs or assigns, that now or hereafter may own, operate, manage or control within this State any ... solid waste collection, solid waste disposal ... system, plant or equipment for public use[ ]....

*N.J.S.A.* 13:1E–27 then provided: [3]

> Any solid waste facility constructed, acquired or operated pursuant to the provisions of this amendatory and supplementary act shall be deemed a public utility and shall be subject to such rules and regulations as may be adopted by the Board of Public Utility Commissioners in accordance with the provisions of the "Solid Waste Utility Control Act of 1970" (P.L.1970, c. 40, C. 48:13A–1 et seq.).

WM's application to the Board for a factual hearing on whether it was to be regarded and treated as a public utility was properly rejected. Its status as a public utility was clear as a matter of law.

As public utilities, appellants were therefore subject to the "most sweeping" and "widest" range of regulatory power. *Town-*

---

[3] This provision was amended in 1991, which amendments are not relevant to the issues at bar.

*ship of Deptford v. Woodbury Ter. Sewerage Corp.,* 54 *N.J.* 418, 423–24, 255 *A.*2d 737 (1969) (citing *In re Public Service Electric and Gas Co.,* 35 *N.J.* 358, 371, 173 *A.*2d 233 (1961)). The sovereign power of the State over public utility rate contracts is well stated at 73B *C.J.S. Public Utilities* § 17, at 164 (1983), as follows:

> Every contract with respect to utility rates is conclusively deemed to be made with knowledge and in contemplation of the sovereign power of the state to alter it, and hence no objection can be raised that the state regulation impairs the obligation of contract ... or deprives the contracting parties of property without due process of law[ ]. ...

The Board properly exercised its continuing jurisdiction over the WM and SWTR contracts starting with its initial order of July 31, 1987, granting sub-certificates of Public Convenience and Necessity to each entity.

It is argued that since WM's and SWTR's July 1, 1987, contracts with the County were awarded as the result of competitive negotiations under the emergency bidding exception contained in *N.J.S.A.* 40A:11–6 rather than as the result of an award to the lowest responsible bidder following open and competitive public bidding that regulatory review and modification is precluded and the contracts must be accepted as written. WM and SWTR rely upon the particular wording of *N.J.S.A.* 40A:11–6(b) which provides that upon furnishing services in accordance with a contract awarded under the emergency bidding exception, "the contractor furnishing such ... services shall be entitled to be paid therefor and the contracting unit shall be obligated for said payment."

■ We do not view the LPCL as evincing a legislative intent to restrict, modify, or limit public utility contracts from regulatory oversight and from the review and modification authority of the Board. The Board's legislative charge is to protect the interests of the rate paying public whether the contract setting forth the tariff rates was awarded following open and competitive public bidding or awarded as the result of negotiations in an emergent setting. It defies logic to perceive that the Legislature would seek to protect the public by vesting the Board with jurisdiction to

review utility contracts that are the product of public bidding but leave the public unprotected and deprive the Board of its oversight authority with respect to utility contracts that are negotiated and awarded under emergent circumstances. The Supreme Court in *Application of Borough of Saddle River,* 71 *N.J.* 14, 362 *A.*2d 552 (1976), while recognizing that public bidding is the preferred route to be taken for the award of municipal solid waste contracts, held that contracts awarded without competitive public bidding do not narrow the Board's scope of review or exempt such contracts from regulatory oversight. Particularly, it ruled:

> Such contracts, although their provisions are agreed upon by the parties, are nevertheless subject to modification by the Board of Public Utility Commissioners in the public interest.
>
> [*Id.* at 23, 362 *A.*2d 552 (citations omitted).]

Additionally, this court must discern the meaning of a statute from the plain language contained therein. *Kimmelman v. Henkels & McCoy, Inc.,* 108 *N.J.* 123, 128, 527 *A.*2d 1368 (1987). The plain language of *N.J.S.A.* 40A:11–6(b) entitles the service provider to be paid and for the contracting unit to "take such action as shall be required to provide for the payment of the contract price." Therefore, the rate-setting of such payment remains subject to regulatory oversight for rate-review pursuant to *N.J.S.A.* 48:13A–7(a) and (b).

Moreover, both contracts contained language which required them to be construed in accordance with and be governed by the laws of this State and we are satisfied that both contracts were entered into subject to the acceptance and approval of the Board. A specific clause to that latter effect is contained in the SWTR contract.

Accordingly, both WM and SWTR knew or should have known from the outset in 1987 that they were public utilities and would function and be treated as such.

■ It is patently clear that the Board, and also the DEPE when it succeeded to the regulatory powers of the Board, had the authority to eliminate the applicability of the CPI-based automatic

escalator clause of each contract. Each contract was subject to modification in the exercise of the overriding authority of the Board to act in the public interest. *Saddle River, supra,* 71 *N.J.* at 23, 362 *A.*2d 552. The exercise of such authority was not arbitrary, capricious or unreasonable and did not result in retroactive rule making. Likewise the Board's adoption of what appellants characterize as a "nexus" standard was not arbitrary, capricious, or unreasonable.

*N.J.S.A.* 48:13A–7(b) specifically confers jurisdiction on the Board to adjust rates or charges contained in solid waste disposal contracts in order that the rates result in "just and reasonable rates or charges." As we have decided, such jurisdiction inheres even though the contracts of WM and SWTR were found to be the end product of openly-arrived-at competitive negotiations. The acceptance of the contracts by the Board in its original order of July 31, 1987, was on an "interim, initial and emergent" basis. In its order of January 4, 1989, the Board emphasized that until such time as the claims made pursuant to the CPI escalation clauses were found to be reasonable, the rates being charged the County could not be increased.

In her initial ruling, the ALJ held that the contracts between the County and WM and SWTR were negotiated at arm's length in a competitive market and therefore the CPI clauses were enforceable. However, the Board, while concluding that the contracts were not the result of arm's-length negotiations in a competitive market, found that the CPI-based automatic increases were unrealistic because the cost components of the CPI are unrelated to the cost components of a transfer station and the costs of landfill disposal. The Board reviewed the record presented by appellants and concluded that the record did not demonstrate a "nexus" between the factors contributing to anticipated increases in transfer stations costs and the factors upon which the CPI is based. In so determining, the Board did not create a wholly new "nexus" standard for its rate making review. It simply used a descriptive word and just as well could have used

another synonym for "nexus" to characterize its ruling. The main responsibility of the Board was to determine whether the rates charged the County by WM and SWTR were just and reasonable. In its view, "nexus" meant that WM and SWTR, as public utilities seeking a rate increase, had the burden of proving every aspect of a rate's reasonableness. A meaningful "nexus" or connection must exist between the underlying cost factors (food, household goods, and electronic equipment) built into the CPI and the underlying cost factors (labor, transportation, depreciation, landfill, and disposal costs) built into transfer station operation, which are the components upon which the rate structure depends, so that the resultant rate after applying the CPI factor can be deemed just and reasonable. In this case, the Board, as well as the DEPE, concluded that applying an unrelated multiple, created by the CPI, to the existing rates charged the County would make the rates unreasonable.

■ Accordingly, the use of the term "nexus" was not a new standard but merely another way of defining the burden, incumbent upon the public utilities in seeking an increase in the rate structure, to prove that rates are just and reasonable.

■ The conclusion by the Board as well as the conclusion by the DEPE that the CPI-based automatic increases were not enforceable did not constitute retroactive rule making. The CPI clauses had never been finally accepted by the Board as the Board pointed out in its January 4, 1989, clarification order. The approved rates were interim only. The Board retained the right to modify solid waste disposal contract rates, including the application of the CPI-rate escalator clause, without exception. *N.J.S.A.* 48:13A–7 then provided: [4]

   a.  The board, upon complaint or its own initiative, after hearing, may direct any person engaging in the ... waste disposal business to furnish proof that the

---

[4] This statute was later amended, which amendment does not affect this matter.

charges ... received for such service do not exceed just and reasonable rates or charges for such service.

b. (1) Should the board find that the rates or charges are excessive then it may order the person charging such excessive rates or charges to make an adjustment in the contract to a sum which shall result in just and reasonable rates or charges.

In *Matter of Redi–Flo Corp.*, 76 *N.J.* 21, 38, 384 *A.*2d 1086 (1978), the Court said "there is no doubt that the Board has the *power* to suspend any proposed rate increase" based upon an automatic fuel adjustment escalator clause until such time as it is established that the resulting rate is "just and reasonable."

In recapitulation, judicial review of the reasonableness of applying automatic CPI-based increases to the basic rates charged the County is foreclosed by the standards of our appellate function. We have no warrant to interfere with the regulatory expertise of the administrative agency. Reliance by WM and SWTR on other instances where CPI-based automatic escalators have been allowed is not persuasive in this matter. Each case must rest upon its own peculiar facts.

The Board was not bound to accept the CPI-based automatic rate increase whether or not the clause was contained in a contract negotiated at arm's length in a competitive market by both WM and SWTR with the County. While the County agreed that its taxpaying community would bear the added costs of CPI-based rate increases applied at the rate of 106% to the existing rate structure of each contract, it could not abrogate the Board's statutory responsibility to review and modify public utility contracts to insure a just and reasonable rate or charge. *N.J.S.A.* 48:13A–7. In this regard, neither the Board nor the DEPE abused their discretion or acted in an arbitrary, capricious, or unreasonable manner.

## VI

On November 13, 1992, in granting WM's motion for reconsideration, the DEPE had opted to review the propriety of the $8,000,-000 settlement agreement arrived at by WM with the County, concluding that a settlement agreement seeking to adjust pay-

ments for solid waste utility services like any other contract for utility service is subject to its regulatory jurisdiction. *See Saddle River, supra,* 71 *N.J.* at 23, 362 *A.*2d 552. *See also New Jersey Suburban Water Co. v. Riordan,* 4 *N.J. Misc.* 256, 259, 132 *A.* 318 (Sup.Ct.), *aff'd,* 103 *N.J.L.* 498, 135 *A.* 919 (Err. & App.1926).

WM did not then object to consideration of the settlement agreement by the DEPE and does not now object to the total of $5,907,676 awarded to it by the DEPE for tonnage shortfall adjustments and for landfill taxes paid by it. Our review of the DEPE's August 24, 1994, final decision amply indicates that the reasonableness of the settlement was considered; evidenced by the award to WM of $5,907,676. In practical effect, the settlement agreement was accepted as to that amount and rejected as to the balance.

■ The DEPE, in the exercise of discretion vested in the Commissioner, refused to allow what is tantamount to prejudgment interest on the award to WM. We see no error in this discretionary determination, *Bak–A–Lum Corp. of Am. v. Alcoa Building Prods., Inc.,* 69 *N.J.* 123, 131, 351 *A.*2d 349 (1976); *Busik v. Levine,* 63 *N.J.* 351, 356–57, 307 *A.*2d 571 (1973), especially where, in the absence of an overriding equity, a governmental agency would be called upon to pay the interest. *Division of Youth and Family Services v. County of Middlesex,* 188 *N.J.Super.* 1, 5, 455 *A.*2d 1119 (App.Div.1982). Moreover, the denial of interest was not "a manifest denial of justice." *Coastal Group, Inc. v. Dryvit Sys., Inc.,* 274 *N.J.Super.* 171, 181, 643 *A.*2d 649 (App.Div.1994).

■ Contrary to their contentions, WM and SWTR were not entitled to be treated just "like any other contract vendor" in a free, open, and competitive market. They were public utilities acting in an industry (solid waste) which the Legislature had found to be "a matter of grave concern to all citizens ... and thoroughly affected with the public interest[.]" *N.J.S.A.* 13:1E–2(a). As participants in a regulated industry, WM and SWTR were entitled to a fair rate of return based upon their capital invested and upon

risks undertaken. *State Farm Mut. Auto. Ins. Co. v. State,* 124 *N.J.* 32, 48, 590 *A.*2d 191 (1991). Neither WM nor SWTR urge that their financial health has been jeopardized by the Board's action or by the action of the DEPE in rejecting the CPI-based automatic increases. While an ordinary "contract vendor" may seek to maximize profits, that goal does not characterize the economics of a regulated industry. *See, e.g., Ideal Dairy Farms, Inc. v. Farmland Dairy Farms, Inc.,* 282 *N.J.Super.* 140, 196, 659 *A.*2d 904 (App.Div.), *certif. denied,* 141 *N.J.* 99, 660 *A.*2d 1197 (1995).

## VII

The City of Newark has cross-appealed against SWTR arguing that it was error for the DEPE to find that SWTR's transfer station contract was the product of an arm's-length negotiation in a competitive market. Newark seeks a remand whereby SWTR will be obliged to prove the reasonableness of its rates.

In its final decision on reconsideration rendered August 23, 1994, the DEPE had before it the detailed factual findings made by the ALJ in arriving at her initial decision that both WM's and SWTR's contract were arrived at in a competitive market as a result of arm's-length negotiations. The DEPE reached the same conclusion. The record is replete with evidence that the County mailed approximately 100 solicitations to prospective operators, that nine responses were received, that the County found the proposals submitted by WM and SWTR and transfer station sites proposed to be worthy of consideration and that extensive negotiations took place before the contracts were finalized even though the atmosphere was somewhat heated because of the restricted timeframe facing the County. Accordingly, we do not disturb the conclusion of the DEPE. It was not arbitrary, capricious, or unreasonable and it is supported by substantial credible evidence in the record.

Similarly, we find no merit in Newark's contention that the DEPE's decision not to address SWTR's initial contract rate

base/rate of return standard was an error. The Board and the DEPE did consider the overall reasonableness of the rates charged by WM and SWTR and concluded that absent the CPI-based automatic escalator clause, WM and SWTR had met their burden of proving the reasonableness of the basic initial rate structure.

## VIII

In conclusion, we are satisfied that the Board and the DEPE diligently and thoroughly explored the negotiations and effect of the July 1, 1987, contracts of both WM and SWTR; the reasonableness of the rates charged the County; the impropriety of automatically increasing rates according to the CPI; the efficacy of not giving WM the full benefit of an $8,000,000 settlement agreement with the County, but rather awarding to WM $4,841,-930 in shortfall tonnage adjustments and $1,065,746 in landfill taxes in lieu of the gross settlement amount; and, finally, within their discretion, the denial of interest on the amounts awarded.

Affirmed.