799 A.2d 701

ERG CONTAINER SERVICES, INC., AND GI AUTO SALVAGE CO., INC., PLAINTIFFS–APPELLANTS, v. BOARD OF CHOSEN FREEHOLDERS, MORRIS COUNTY, DEFENDANT–RESPONDENT, AND TOWNSHIP OF MONTVILLE, INTERVENOR/RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued February 20, 2002—Decided June 24, 2002.

Before Judges PRESSLER, WEFING and COLEMAN.

*Robert L. Podvey* argued the cause for appellants (*Podvey, Sachs, Meanor, Catenacci, Hildner & Cocoziello,* attorneys; *Mr. Podvey,* of counsel; *Marianne C. Tolomeo and Steven R. Tombalakian,* on the brief).

*Ronald Kevitz* Morris County Counsel, argued the cause for respondent Board of Chosen Freeholders (*Mr. Kevit,* on the brief).

*Gregory J. Coffey* argued the cause for intervenor/respondent (*Coffey & Sullivan,* attorneys; *Mr. Coffey,* of counsel; *Mr. Coffey and Janet A. Sullivan,* on the brief).

The opinion of the court was delivered by

WEFING, J.A.D.

Plaintiffs ERG Container Services, Inc. and GI Auto Salvage Co., Inc. (ERG) appeal from an order of the trial court upholding a

resolution of the Board of Chosen Freeholders of the County of Morris (Board, or Freeholders) denying ERG's request that the Board amend Morris County's solid waste management plan to include ERG as the operator of a materials recovery facility for construction and demolition debris. We have carefully reviewed the record in light of the contentions advanced on appeal and have concluded the order under review must be affirmed.

I

Although the two companies operate different businesses, they are both owned by the same principals and do business from the same location, a 40–acre tract in Montville, New Jersey, which is located on Old Bloomfield Avenue near its juncture with Route 46. The property borders the Passaic River and is adjacent to a flood plain. It is zoned for business and industrial use. There are residential zones nearby, however. ERG Container Services, Inc. is licensed by the New Jersey Department of Environmental Protection (DEP) as a solid waste collector and transporter and it also leases containers. GI Auto Salvage Co., Inc. operates a junkyard under a license issued by Montville, which is subject to annual renewal. The site has been utilized as a licensed junkyard continuously since 1952. Montville's ordinance licenses ERG to receive "[o]ld or scrap copper, brass, rope, rags, batteries, paper, trash, rubber debris, waste or junked, dismantled, or wrecked automobiles, or parts thereof, iron, steel, and other old or scrap ferrous or nonferrous material."

Although Morris County has met the percentage goals set by the DEP for recycling (indeed, it is one of the few counties to do so), its solid waste management plan does not provide specifically for the handling of construction and demolition debris. One of the basic principles that Morris County has utilized in achieving its success in recycling is its insistence that materials be separated for recycling purposes at their source before entering the waste stream. As ERG's counsel argued to the trial court, source separation may often prove to be impracticable when dealing with

construction and demolition waste; when a building is being renovated or rehabilitated, for example, a contractor generally will simply gut the building's entire interior and place the contents into trailers for disposal. It is DEP's view that this results in much of the debris being merely transported to landfills, rather than being diverted to other uses, including recycling.

In March 1998, DEP directed the Morris County Municipal Utilities Authority to submit a detailed administrative action plan (*N.J.A.C.* 7:26-6.11(b)9) setting forth how it proposed to increase recycling of construction and demolition waste. ERG proposed that it operate a materials recovery facility at its Montville location. According to ERG, it would collect construction and demolition waste in its own vehicles, transport it to a building it proposed to construct on-site, separate out those items which could be recycled, and then dispose of the remainder. ERG contended that such a facility would bring Morris County into compliance with the DEP's directive to the county and would also be a source of revenue to ERG.

ERG needed approval from the DEP to construct and operate such a facility, but under New Jersey's comprehensive system regulating the collection and disposal of solid waste, it could not seek such DEP approval without Morris County first amending its solid waste management plan in a manner that would include ERG.

All counties in New Jersey, as well as the Hackensack Meadowlands District, are mandated under *N.J.S.A.* 13:1E-23 to have a solid waste management plan. The statute provides that an amendment to such a plan must be submitted both to the county's Solid Waste Advisory Council and then to the Freeholders for approval. That procedure was followed here.

ERG's proposal generated significant opposition from the residents of Montville who lived in the area nearby ERG's property. They appeared both before the Solid Waste Advisory Council and the Freeholders to express that opposition. The Council considered ERG's application on two occasions and approved it on each.

The intensity of the neighbors' opposition is reflected in a memorandum to the Freeholders by the Vice–Chairman of the Council, detailing the verbal abuse to which members of the Council were subjected by opponents to the project.

Following the approval of the proposed plan amendment by the Council, the matter was presented to the Freeholders, who then twice voted to reject the proposed amendment to the County's solid waste management plan. After the first resolution disapproving the amendment, ERG commenced an action in lieu of prerogative writs, and the trial court reversed and remanded the matter to the Board, finding certain deficiencies in how the Board had considered the matter. Thereafter, the Board held four additional hearings. It again voted to disapprove the amendment, and ERG responded by commencing a second action in lieu of prerogative writs in the trial court. This time, however, the trial court found that the Board had corrected the initial deficiencies, and refused to set aside the decision of the Board. ERG has appealed to this court from that order.

The trial court found that the Board, through the discussion among the members and the resolution they adopted, articulated four reasons why, in its view, the county's solid waste management plan should not be amended to include ERG's proposal to operate a materials recovery facility for construction and demolition waste: that there was no need for such a facility within the county; that plaintiff was not an environmentally responsible operator; that the site was unsuitable; and that ERG had not demonstrated its ability to operate such a facility and achieve an acceptable rate of recovery.

The trial court, during the course of its oral opinion, criticized the Board for not complying with all of the court's directives in connection with the earlier remand. Nonetheless, after reviewing the record created before the Board as a whole, the trial court concluded that while the Board's finding on the first issue was not supportable in light of the clear directive from DEP to provide for

such a facility, the remaining findings could reasonably have been made on the record created and thus upheld the Board resolution.

## II

▉▉▉ We turn first to the question of the correct standard of review, for ERG contends that the trial court employed the wrong standard when it considered the matter. It is important in this regard to distinguish between the standard of review the trial court should have employed in reviewing the actions of the Board and the standard of review that we employ in reviewing the decision of the trial court. As to the latter, the question whether the trial court was correct in the standard it employed is a question of law and thus our review is plenary. *Manalapan Realty v. Manalapan Tp. Committee*, 140 *N.J.* 366, 378, 658 *A.2d* 1230 (1995). As to the former, the Board acted in a quasi-legislative administrative capacity when it voted on the proposed amendment to the county's solid waste management plan. *In re Amendments to Solid Waste Management Plan of Hackensack Meadowlands Dev. Comm'n*, 275 *N.J.Super.* 375, 389, 646 *A.2d* 463 (App.Div.), *certif. denied*, 139 *N.J.* 289, 654 *A.2d* 470 (1994). As such, the trial court was called upon to employ the traditional standard of review applicable in a review of decisions of an administrative agency, that is, whether the findings could reasonably have been reached on "sufficient" or "substantial" credible evidence in the record, considering the proofs as a whole, with due regard for the credibility judgments of those who heard the witnesses. *In re Taylor*, 158 *N.J.* 644, 656, 731 *A.2d* 35 (1999); *George Harms Constr. Co. v. New Jersey Turnpike Auth.*, 137 *N.J.* 8, 27, 644 *A.2d* 76 (1994).

▉▉▉ ERG argues that the trial court improperly employed a weaker standard of review. In support of this contention it points to several instances in the trial court's oral opinion in which it characterized the decision of the Board as "plausible" based on the presentations before it. ERG's argument, however, overlooks the fact that within its opinion the trial court carefully defined the

term "plausible" to mean "reasonably based on tangible solid evidence." In addition, the trial court directly relied upon our decision in *Petition of County of Essex*, 299 *N.J.Super.* 577, 691 *A.*2d 846 (App.Div.), *certif. denied*, 151 *N.J.* 463, 700 A.2d 876 (1997) where we clearly stated the appropriate standard of review:

> [A]ppellate courts have a limited and structured role in reviewing the decisions of administrative agencies. We will not reverse an agency decision unless it is "arbitrary, capricious, or unreasonable or is not supported by substantial credible evidence in the record as a whole." If we find sufficient credible, competent evidence in the record to support the agency's conclusion, we are bound to uphold the agency findings.... We may not vacate an agency's determination merely because of doubts as to its wisdom or because the record may support more than one result.
>
> [*Id.* at 591–92, 691 *A.*2d 846 (citations omitted).]

It is, moreover, particularly appropriate that a court exercise a limited scope of review in a matter such as this, which involves an elected Board acting in a quasi-legislative capacity and making policy choices. *Matter of Hunterdon County Bd. of Chosen Freeholders*, 116 *N.J.* 322, 328–29, 561 *A.*2d 597 (1989). Those policy choices are, to a large degree, the purview of the Board, and a court must be careful not to substitute its own views of a desirable policy for those of the Board. We are satisfied that the trial court's use of the term "plausible" within its oral opinion was a matter of verbiage, not substance, and we see no error by the trial court in this regard.

We turn then to the three questions the trial court said the Board had reasonably decided based on the record before it: the environmental responsibility of ERG, the appropriateness of the site, and the sufficiency of the proof ERG presented. There is no necessity to analyze the question whether Morris County needs such a facility; the County has not cross-appealed from the trial court's determination that the Board's decision that such a facility was not needed had no basis in light of the contrary determination reached by DEP.

## A

The objectors presented evidence to the Board challenging two aspects of ERG's sensitivity to environmental issues and compli-

ance with DEP requirements. The first related to problems that developed on the site when two underground storage tanks were removed; the second to a series of Notices of Violation that DEP issued to ERG.

 As to the first, two underground storage tanks had been located on the tract, one for gasoline and one for diesel fuel. The record in connection with this proceeding is silent on when the tanks were installed, but they were removed in 1992 when there was an indication that some leakage had occurred. In the view of the Board, ERG did not move expeditiously to identify the extent of the migration of the contamination which had occurred. Since the matter had not been completely concluded by the time the Board commenced its second round of hearings in 1999, we concur with the trial court that this decision could reasonably have been made by the Board.

 The second aspect of ERG's environmental responsibility related to a series of five Notices of Violation it had received from DEP between December 1996 and July 1997. These related to DEP's assertion that ERG was improperly receiving construction and demolition waste at the site without first having received a permit from DEP. ERG contested the violations, asserting it was authorized to receive such waste under the terms of its municipal license. When the second set of hearings before the Freeholders commenced, that issue remained pending and unresolved in the Office of Administrative Law. By the time the hearings concluded before the Freeholders, ERG came to an understanding with DEP; although it made no admission of liability, a penalty of $20,000 was assessed for its actions. With regard to this aspect of ERG's alleged environmental responsibility, the trial court expressed the view that the Board had properly concluded that ERG had "stonewalled" the DEP on these Notices, only reaching a Memorandum of Agreement during the course of the second set of hearings.

Having reviewed the record, it is our judgment that the assertion that ERG "stonewalled" the DEP is not entirely supportable.

ERG took a legal position, maintaining that its actions were authorized under its Montville license, and sought to defend that position within the proper forum, the Office of Administrative Law. ERG should not be penalized for attempting to invoke the procedural rights afforded to it.

In addition, the record is silent on the initial stance DEP assumed in connection with these Notices. One cannot conclude ERG was "stonewalling" DEP without knowing the severity of the sanctions DEP was initially proposing.

### B

The next question, then, is the suitability of the site itself. The trial court ruled that placing a materials recovery facility on this location would "overburden" the site, and that in consequence, the Board's decision that the site was "unsuitable" could reasonably have been made on the record before the Board. Initially, we note some uncertainty as to the precise meaning of the trial court's conclusion that the site would be "overburdened" by ERG's proposal. We do not, for instance, know if it refers to the site's proximity to the Passaic River and its flood plain. The DEP has, in the past, however, not hesitated to authorize the placement of a construction and demolition waste recycling facility within wet-lands. *In re Amendments, supra,* 275 *N.J.Super.* at 380–81, 646 *A.*2d 463. ERG was proposing the construction of a large building with a concrete floor upon which all operations would take place, thus preventing any groundwater contamination. The potential environmental consequences of such placement would, moreover, seem to be a question particularly within DEP's purview.

On the other hand, the trial court may have been referring to the potential impact of increased noise and traffic upon neighbors when it said the site would be overburdened. The proposed use, however, was a permitted one within the zone. In such an instance, intensification of a permitted use is more appropriately addressed by imposing appropriate conditions and restrictions in connection with site plan approval, rather than by completely

barring the proposed use. *Stop & Shop v. Bd. of Adjustment of Springfield,* 162 *N.J.* 418, 438–39, 744 *A.*2d 1169 (2000); *N.J.S.A.* 40:55D–41; *N.J.S.A.* 40:55D–50.

## C

Finally, we turn to the issue of the quality of the proofs ERG presented as to the feasibility of its proposal. ERG complains that the Board, by demanding greater proof, usurped the role of the DEP in deciding technical, regulated topics. Having reviewed the record in detail, however, we do not agree. ERG contended that its operation would be able to achieve a 65% rate of recovery. There was no explanation, however, as to how that rate would be achieved. Because there were no facts upon which it was based, it was an entirely net opinion. *Buckelew v. Grossbard,* 87 *N.J.* 512, 524, 435 *A.*2d 1150 (1981).

■ We agree with ERG that the Board was not the proper venue to present the detailed specifications of its proposal, for the proper review of such specifications would entail a level of technical expertise beyond the Board's ken. As we have recognized in the past, there is clearly a distinction between the "planning phase," represented by amending the County's solid waste management plan, and the "technical phase", involving a "detailed showing of the economic, technical and environmental feasibility of the project." *In re Amendments, supra,* 275 *N.J.Super.* at 381, 646 *A.*2d 463. The Board was entitled, however, to expect the submission of evidence detailing how plaintiff proposed to construct and operate such a facility, together with evidence of how such facilities operate in other locations. Only then would it be in a position to determine whether a projection of 65% rate of recovery was in any way realistic and what conditions and restrictions would be appropriate.

We note in this regard that, in our judgment, the material put forth by the objectors on this issue suffered from the same lack of specificity. The objectors referred to certain charts obtained from the DEP's website which they used to challenge the proffered 65%

rate of recovery. There was no explanation, however, of how that information was compiled or what it represented substantively in comparison to plaintiff's proposal.

In our judgment, this deficiency in ERG's proof on this last issue was crucial and justified the decision of the Board not to amend its solid waste management plan. Accordingly, we affirm the decision of the trial court.

Affirmed.